# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | Criminal No.  3:18-CR-00025 (NKM) |
| BENJAMIN DRAKE DALEY | : | |
| MICHAEL PAUL MISELIS | : | |
| THOMAS WALTER GILLEN | : | |

_____

## OMNIBUS RESPONSE TO DEFENDANTS' MOTION TO DISMISS

### Introduction

This case is not about free speech or the right to assemble for political purposes.  This case is about four individuals that coordinated, planned, and travelled across the United States to engage in violence leading up to and during the Unite the Right Rally on August 11-12, 2017, in Charlottesville, Virginia.   In their motion, Defendants seek to cloak themselves in First Amendment principles in the hopes that framing their behavior as political in nature will somehow shield them from the consequences of their violent intentions and their violent actions.   They cannot.

The case before this Court is about four individuals that turned their political views into violent action, and in doing so, they violated federal law.  That law, the Anti-Riot Act of 1968, is clear and unambiguous: if anyone travels or uses the facilities of interstate commerce with a riotous intent, and then commits acts in furtherance of that intent, they are in violation of 18 U.S.C. § 2101.  That law does not discriminate between popular and unpopular views and it does not draw distinctions between violent actions committed by members of the Rise Above Movement

1

("RAM") or others. Instead, the Anti-Riot Act criminalizes unlawful action and unlawful calls to action, and that law that has been universally held to be constitutional.

Moreover, the facts at trial will show that these Defendants did not travel to Charlottesville from California simply to express their political views. Instead, Defendants travelled to Charlottesville looking to fight and to hurt those who disagreed with their political views. Defendants communicated with each other for months about their experiences at Huntington Beach and Berkeley, they celebrated the violent blows they inflicted on their political enemies, and they planned to and succeeded in doing the same in Charlottesville. And after Charlottesville, they celebrated and reveled in their violent "victories" just as they did after rallies in California: "And lol @ u choking a bitch in the 2nd [picture]," "[l]ooked fun … You should've ran in chest kicked that faggot down the stairs," and "Now I know how you felt after Berkeley. Next time he's going flying."

And labelling one's actions "political" to invoke First Amendment protection no more immunizes one from the legal consequences of violent actions than does wearing an "I Love the Second Amendment" T-shirt shield an individual from the legal consequences of shooting another person. But that is precisely what Defendants ask this Court to do: sanction illegal violent conduct when it occurs in the context of a political rally. Defendants' efforts to conflate violent actions with peaceful political assemblage to escape a deserved prosecution should be rejected wholesale.

### Factual Background

The United States recognizes that this Court is familiar not only with the indictment in this case, which Defendants summarize in their Motion to Dismiss but more generally with the tumultuous events in Charlottesville during the summer of 2017. Indeed, currently pending before this Court is a civil case, *Sines v. Kessler*, 3:17-cv-00072-NKM-JCH, which recounts many of the

2

key events that form a part of the instant case. Nevertheless, while the United States will not recount the facts set forth in the indictment or those facts that have been recited in other cases and throughout the press, given Defendants' general challenge to the prosecution and their claims to First Amendment protection, a short summary of the evidence the United States intends to produce at trial should clarify any misconceptions about why Defendants have been indicted. The evidence offered at trial will include the following facts:

Defendants promoted themselves and their organization as a white nationalist outfit that lived clean and healthy lives so they would be fit to "smash[] commies" and others who disagreed with their political views. Defendants took pride in training together so they would be prepared to fight at rallies. And the evidence at trial will show that Defendants, as well as other members of RAM, put themselves in the center of the violent action at Huntington Beach on March 25, 2017, and at Berkeley on April 15, 2107.

The evidence will show that at the Berkeley rally, Defendants and other members of RAM "crossed the barrier separating the attendees and protestors, and assaulted protestors" and pursued those protestors that were vacating the area. ECF No. 59, p. 1. After the March 2017 events in Berkeley, Defendants celebrated their victories and sought publicity in the white nationalist press for being the "first guys to jump the barrier and engage" with their enemies. Defendants and RAM promoted themselves as "the only alt right crew that actually beats antifa senseless and wins rallies."

After Defendant Miselis broke a bone in his hand at Berkeley by punching another individual in the back of the head, RAM altered its training regime to focus on palm strikes and elbows. Soon after the Berkeley riots in April 2017, Defendant Miselis reluctantly declined to

attend another Berkeley rally surrounding an appearance by Anne Coulter because of his broken hand, but expressed hope the event would be delayed so he could heal and engage in the fight.

When assembling the group for travel to Charlottesville, Defendants did not express their excitement about assembling to exercise their First Amendment rights, nor did Defendants join forces because each offered some particular skill in oral advocacy or flag waving. Instead, Defendants "were stoked to have" co-defendant Cole White join them in Charlottesville because he is an "excellent fighter."

Defendants coordinated their travel to Charlottesville, and took steps together to conceal their true purpose in attending the Unite the Right Rally, including circulating instructions to use cash to avoid a paper trail. As revealed at a pre-trial detention hearing, Defendant Daley lied about his plan to attend the rally and asked a family member to purchase his airplane ticket for him despite having a debit card and plenty of resources. On the way from the airport to Charlottesville, Defendants Daley and Miselis stopped at Wal-Mart to purchase helmets and athletic tape in anticipation of engaging in fighting with others.

Evidence at trial will confirm that, on the grounds of the University of Virginia, Defendants participated in the torch-lit march across the Lawn to the Jefferson statute at the Rotunda on the night of August 11, 2017, where the first acts of violence took place. Video and photo evidence and other testimony will establish that Defendants came to Charlottesville to engage in violence. Similar evidence will prove that Defendants engaged in multiple bouts of violence as aggressors at the Unite the Right Rally on August 12, 2017. And Defendants' own post-rally statements and communications will prove that they took pride in "choking a bitch" while expressing regret for not "kick[ing] that faggot down the stairs." The evidence at trial will show that once their actions

became headlines on television news across the country, Defendants organized themselves and deleted as much evidence of their violent behavior and intent as possible.

Finally, evidence at trial will establish that in the months following Charlottesville, Defendants travelled internationally to meet other white nationalist groups, including the neo-Nazi Ukrainian National Guard group known as the Azov Battalion. Defendants travelled to Ukraine, among other places, to train with such organizations and engage in mixed-martial arts tournaments. When stopped at the border returning from these trips abroad, Defendants wiped data from their computers and mobile devices when pulled for secondary screening.

## Judicial Notice

Defendants request this Court take judicial notice of certain aspects of Judge Conrad's August 11, 2017 Memorandum Opinion in *Kessler v. City of Charlottesville*, 2017 U.S. Dist. LEXIS 128330 (W.D. Va. Aug. 11, 2017). The United States objects.

Federal Rule of Evidence 201 permits a court to "judicially notice a fact that is not subject to reasonable dispute because it is: (1) generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Only "indisputable facts … are susceptible to judicial notice." *United States v. Awni Shauaib Zayyad*, 741 F.3d 452, 463 (4th Cir. 2014) (quoting *Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 317 n.* (4th Cir. 2004) (quotations omitted). The Fourth Circuit recognizes that "facts adjudicated in a prior case … do not meet either test of indisputability contained in Rule 201(b)." *Id.* at 464 (quoting *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (quotations omitted)).

The issue before Judge Conrad related to whether one of the organizers of the Unite the Right rally was entitled to an emergency injunction enjoining the City of Charlottesville from

5

revoking his permit to conduct a demonstration at Emancipation Park on August 12, 2017. *Kessler*, 2017 U.S. Dist. LEXIS 128330 at *9. Notably, Kessler filed his suit on the evening of August 10, 2017, followed by an emergency motion for preliminary injunction on August 11, 2017, the City of Charlottesville filed a brief in opposition on August 11, 2017, and the Court held a hearing on that same day. The facts and findings of Judge Conrad, however, provide information only as known or determined under extreme time constraints and discuss disputable events that occurred ***prior to the events alleged in the indictment***. Likewise, the events discussed in Judge Conrad's opinion reflect the positions of parties not involved in the present criminal case: Jason Kessler and the City of Charlottesville.

Furthermore, Rule 201 permits judicial notice of "facts" not legal conclusions. What Defendants really seek to do is to lead the Court into some of the fundamental factual disputes that will form part of the litigated case (e.g., to explore what the purpose of Defendants' travel to Charlottesville or their intent in travelling), something this Court has declined to do because such disputes are "appropriate for discussion later in the litigation." *Sines*, 324 F. Supp. 3d at 806. *See also Goldfard v. Mayor & City Council of Baltimore*, 791 F.3d 500, 511 (4th Cir. 2015) ("We are mindful that judicial notice must not be used as an expedient for courts to consider matters beyond the pleadings and thereby upset the procedural rights of litigants to present evidence on disputed matters."). Accordingly, the United States objects to judicial notice of Judge Conrad's opinion and request the Court deny Defendants' request.

## I.    The Indictment is Sufficient[1]

The indictment in this case passes muster under the Constitution and Federal Rule of Criminal Procedure 7.   An indictment is constitutionally sufficient where it "contain[s] the elements of the offense charged, fairly inform[s] a defendant of the charge, and enable[s] the defendant to plead double jeopardy as a defense in a future prosecution for the same offense." *United States v. Palin*, 874 F.3d 418, 423-24 (4th Cir. 2017) (quoting *United States v. Daniels*, 973 F.2d 272, 274 (4th Cir. 1992)).  Rule 7(c)(1) only requires that an indictment include "a plain, concise, and definite written statement of the essential facts constituting the offense charged…." Fed. R. Cr. P. 7(c)(1).

The current indictment clearly "gives defense counsel adequate notice of the charges," and in fact does far more than "merely track[] the statutory language" that the Supreme Court determined is otherwise "generally sufficient."   *United States v. American Waste Fibers Co.*, 809 F.2d 1044, 1046-47 (4th Cir. 1987) (citing *Hamling*, 418 U.S. at 117)).   Likewise, the instant indictment provides significantly more detailed facts and circumstances than required by law.  *See, e.g.*, *United States v. Amend*, 791 F.2d 1120, 1125 (4th Cir. 1986) (upholding sufficiency of indictment where indictment tracks language of the statute but fails to name the "five other persons" required to establish a continuing criminal enterprise).   Though provided in abundance here, "[p]recise details are not required for an indictment to pass muster under [the Constitution]." *United States v. Witasick*, 2008 U.S. Dist. LEXIS 34654, *5 (W.D. Va. Apr. 28, 2008) (Kiser, J.) (citing *American Waste Fibers Co.*, 809 F.2d at 1046-47 (4th Cir. 1987)).   While Defendants make

---

[1] Defendants challenge both counts of the indictment, but the main thrust of Defendants' challenges are to the constitutionality of the Anti-Riot Act, 18 U.S.C. § 2101.  Defendants' challenges to Count One of the indictment depend entirely on the success of the same arguments offered against Count Two.  Accordingly, the United States frames its answer in the same manner and adopts and incorporates its arguments related to Count Two into its arguments for Count One.

it clear they would prefer such a requirement, "indictments do not have to enumerate every possible legal and factual theory of defendants' guilt." *Witasick*, 2008 U.S. Dist. LEXIS 34654 at *5 (quoting *American Waste Fibers Co.*, 809 F.2d at 1047)). Count Two is more than sufficient as plead.

Defendants contend that Count Two of the indictment should be dismissed under Rule 12(b)(3)(B) because it "fails to state an offense" and "plainly fail[s] to inform [Defendants] of the offense with which [they] are charged." ECF No. 72, pp. 7-8. Defendants are each charged with violating the Anti-Riot Act of 1968, which, at the most basic level, consists of two simple elements: (1) interstate travel with a riotous intent and (2) some overt act or attempted act in furtherance of that riotous intent. *See* 18 U.S.C. § 2101(a); *In re Shead*, 302 F. Supp. 560, 565 (N.D. Cal. 1969) ("Congress has made it a crime if there is an intent to promote a riot at the time of use of interstate or foreign facilities and at that time or thereafter, the additionally-required overt acts are committed.").

The plain language of the indictment in this case sets forth the first element: that on or about August 11, 2017, Defendants travelled in interstate commerce from California to Charlottesville, Virginia with an unlawful riotous intent as specifically prohibited in 18 U.S.C. § 2101(a)(1)-(4) and as defined in 18 U.S.C. § 2102. ECF No. 8, ¶13. Subparagraphs (a) and (b) of paragraph 13 of the indictment set forth the second element of the offense and provides the time, place, and manner of the alleged attempts and acts, including on the evening of August 11, 2017, on the grounds of the University of Virginia and on August 12, 2017, in and around the vicinity of Emancipation Park in Charlottesville, Virginia. *Id.*

Paragraphs one through seven of the indictment, which are incorporated by reference into Count Two, and largely ignored by Defendants in their motion, provide further detail of the "facts

and circumstances" of the offense charged. *See Hamling*, 418 U.S. at 117-18 (an indictment must contain "the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged.") (citations omitted)). The facts and circumstances outlined in the indictment here far exceed what is required by law. Here, the indictment details that Defendants' openly expressed anti-Semitic, racist, and white supremacist views, and alleges that Defendants promoted violence against those that they believed held opposing political views. ECF No. 8, ¶ 2, 6.

The indictment recounts that Defendants publicized their physical training and mixed martial arts street-fighting techniques as part of RAM, an "alt right" and "nationalist" group that promoted violence against those they believed to hold opposing political views. ECF No. 8, ¶ 4-6. The United States also alleges that Defendants previously used facilities of interstate commerce to attend several other political rallies where they prepared to and actually engaged in physical acts of violence. ECF No. 8, ¶ 7.

The allegations in the indictment are clear that Defendants participated in the nighttime torch-lit march on the grounds of the University of Virginia on August 11, 2017, that culminated in violence at the foot of the Thomas Jefferson statute by the Rotunda. ECF No. 8, ¶ 2, 7, 13. The indictment alleges that Defendants incited, promoted, encouraged, participated in, and carried on in the riot on the grounds of the University of Virginia on August 11, 2017. Furthermore, the indictment specifically alleges that Defendants committed acts of violence in furtherance of that August 11, 2017 riot, and aided and abetted other persons inciting and participating in and carrying on in a riot and committing acts of violence in furtherance of that riot. ECF No. 8, ¶ 13. Finally, the indictment alleges similar facts and circumstances surrounding the Unite the Right Rally near Emancipation Park in Charlottesville, Virginia on August 12, 2017, where Defendants committed

9

additional acts of violence in furtherance of a riot, *inter alia*, after having travelled from California to Virginia on August 11, 2017, with the intent to engage in such unlawful activities. ECF No. 8, ¶ 3, 4-7, 13.

Put simply, Count Two of the indictment sets forth the elements of the Anti-Riot Act, informs Defendants of the charges against them, and enables Defendants to plead double jeopardy for any future prosecutions. *Palin*, 874 F.3d at 423-24. Accordingly, it is sufficient, and Defendants' claim must fail.

## II.     The Anti-Riot Act is Constitutional

Despite Defendants' claim that Count Two "seeks to punish defendants for engaging in protected First Amendment freedoms of speech and peaceable assembly," the indictment seeks to punish the unlawful actions of Defendants, not protected speech or lawful assemblage. Defendants travelled with the intent to engage in violence with their political foes and then engaged in such unlawful conduct.

Nevertheless, Defendants lodge several constitutional attacks on the Anti-Riot Act, including "facial" and "as applied" challenges. As this Court is aware, a facial challenge tests whether a statute in all of its applications is constitutional. *See, e.g.*, *Sec. of Md. v. Joseph H. Munson, Co.*, 467 U.S. 947, 968 (1984); *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982) (noting a "facial challenge" tests whether a statute is 'impermissibly vague in all of its applications'"). Conversely, an "as applied challenge" tests the constitutionality of a statute as applied only to the "complainant's conduct." *Hoffman Estates*, 455 U.S. at 495.

First, Defendants lodge a facial "void for vagueness" constitutional challenge under the Due Process Clause of the Fifth Amendment. Second, they claim that the Anti-Riot Act is

unconstitutionally overbroad pursuant to the First Amendment. Third, they claim that the Anti-Riot Act exceeds Congress's authority under the Commerce Clause.

All of these challenges fail. The Anti-Riot Act has repeatedly withstood constitutional scrutiny, including identical challenges to those posed by Defendants in this case. As detailed below, the decisions of these prior courts addressing the very same issues presented today confirm that the Anti-Riot Act is just as constitutional in 2019 as it was in 1968.

### A. Defendants Cannot Bring A Vagueness Challenge, and Even If They Could, the Anti-Riot Act is Not Vague

Defendants first lodge a facial attack against the Anti-Riot Act as void for vagueness under the Due Process Clause. Specifically, Defendants complain of "three sources of indeterminacy" in the statute including (1) the definition of "riot" in 18 U.S.C. § 2102(a), (2) the terms "to incite a riot" or to "organize, promote, encourage, participate in, or carry on a riot" in 18 U.S.C. § 2102(a), and (3) a perceived, albeit incorrect, sense that the *mens rea* is only required at the moment of travel and not at the time of any subsequent overt act.

### 1. *Defendants Cannot Lodge a Facial Challenge for Vagueness*

Defendants' Fifth Amendment Due Process facial challenge for vagueness fails before it starts. The Supreme Court has made clear: "A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19 (2010). "That rule makes no exception for conduct in the form of speech" and "does not turn on whether a law applies to a substantial amount of protected expression." *Id.* at 19-20. Put simply, because the Anti-Riot Act "clearly prohibits the defendant's conduct, the defendant cannot challenge, and a court cannot examine, whether the law may be vague for other hypothetical defendants." *United States v. Hosford*, 843

F.3d 161, 170 (4th Cir. 2016) (discussing *Holder*, 561 U.S. at 18-19 and *Hoffman Estates*, 455 U.S. at 495).

Defendants do not mention the Supreme Court's decision in *Holder* or its progeny. They also do not dispute that the statute clearly covers their alleged conduct. Instead, they launch into three sources of purported "indeterminacy" in the Anti-Riot Act. However, this Court need not (and should not) even reach those claims. Because Defendants' conduct clearly falls within the ambit of the statute, they cannot now claim the statute is vague as applied to others, and their claim should fail at the outset.

> 2. *Even if Defendants Could Lodge a Facial Challenge, the Anti-Riot Act is Not Vague*

Even if Defendants could lawfully articulate a Fifth Amendment Due Process challenge, which *Holder* precludes, Defendants' challenge still fails.[2] First, neither the definition of "riot" nor the terms "to incite a riot" or to "organize, promote, encourage, participate in, or carry on a riot" are in any way vague. The terms Defendants complain of are specifically defined by 18 U.S.C. § 2102(a) and (b). The definition of "riot" requires that three or more persons assemble as part of a public disturbance involving any act(s) or threat(s) of violence that present a clear or present danger of damage or injury to another person or property, or which actually damages or injures another or another's property.

Here, the indictment alleges that Defendants engaged in acts of violence on August 11-12, 2017, as part of two related, but distinct public disturbances, the torch-lit rally and the Unite the Right rally in Charlottesville, Virginia. The indictment also describes numerous overt acts in furtherance of Defendants' conspiracy to violate 18 U.S.C. § 2101, including violent acts

---

[2] The government does not read Defendants' brief to include an as-applied challenge under its Due Process Clause claims of vagueness. Instead, Defendants appear to launch an as-applied challenge only in the context of their First Amendment overbreadth challenge, but for the sake of completeness, the government provides its response.

committed at public disturbances in Huntington Beach, California in March 2017 and in Berkeley, California in April 2017. ECF No. 8, ¶ 10. Notably, Defendants do not voice concern over subsection (a)(1) of 18 U.S.C. § 2102, the conduct at issue in this case, and instead focus on precisely the sort of facial challenge precluded under *Holder*.

Defendants' central complaint about the definition of "riot" stems from subsection (a)(2) and abstract, undefined hypothetical circumstances not present before this Court, an analytical path specifically barred by the Supreme Court in *Holder*. 561 U.S. at 19 ("The Court of Appeals did not adhere to [correct] principles … [and b]y deciding how the statute applied in hypothetical circumstances, the Court of Appeals' discussion of vagueness seemed to incorporate elements of First Amendment overbreadth doctrine," resulting in reversible error.). Even addressing some "abstract assessment of chance," purportedly triggered by an inquiry about the meaning of a "threat," Defendants' argument fails. ECF No. 72, p. 12.

Assessment of a "threat" or the ability to execute a threat is not only intelligible to persons of common intelligence, but is a well-established principle in criminal law that does not require some abstract assessment of risk. Indeed, courts constantly engage in analysis of threats. For example, the Supreme Court has opined that "[t]rue threats [] encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). Mere political hyperbole has been held to not constitute a true threat. *Watts v. United States*, 394 U.S. 705, 708 (1969) (reversing a conviction for making a threat to the President where defendant stated during a public rally on the Washington Monument grounds "If they ever make me carry a rifle the first man I want to get in my sights is L. B. J."). Unlike the "wholly subjective" standard required to void a statute for vagueness discussed above, the Fourth Circuit has

13

consistently "employed an *objective test* so that we will find a statement to constitute a 'true threat' if an ordinary reasonable recipient who is familiar with the context . . . would interpret the statement as a threat of injury." *United States v. White*, 670 F.3d 498, 507 (4th Cir. 2012) (quoting *United States v. Roberts*, 915 F.2d 889, 891 (4th Cir. 1990) (quotations omitted) (emphasis added)). Defendants' "first source of indeterminacy" fails.

Second, Defendants contend that the terms "to incite a riot" and "to organize, promote, encourage, participate in, or carry on a riot" found in 18 U.S.C. § 2102(b) are void for vagueness because "[t]his standard is subjective, and impossible to define…." ECF No. 72, p.12. Like the terms defined in section 2102(a), the terms complained of in subsection (b) are patently understandable to persons of common intelligence and have settled legal meaning. Importantly, the terms are specifically defined in the statute and exclude "the mere oral or written (1) advocacy of ideas or (2) expression of belief, not involving advocacy of any act or acts of violence or assertion of the rightness of, or the right to commit, any such act or acts." 18 U.S.C. § 2102(b).

Likewise, there is nothing novel about laws that prohibit the solicitation or incitement to acts of violence or threats to engage in such acts. Courts have uniformly held that concepts such as incitement, promotion, encouragement, and solicitation to engage in unlawful acts remain categorically outside of First Amendment protection. *Williams*, 553 U.S. at 297. For example, it is lawful for the KKK to burn a cross to express an opinion, but that same act of burning a cross becomes illegal when it is coupled with an intent to intimidate others. *See Virginia v. Black*, 538 U.S. 343 (2003). At least one federal court has found sufficient an indictment that, without requiring any further overt acts, alleged solicitation of a generally issued fatwa urging Muslims to "fight the Jews and to kill them wherever they are" because "statements that instruct, solicit, or persuade others to commit crimes of violence are not protected by the First Amendment and may

14

be prosecuted." *United States v. Sattar*, 272 F. Supp. 2d 348, 374 (S.D.N.Y. July 22, 2003). Even the posting of personal information about a jury foreperson on a white supremacist website in the context of stating "everyone associated with the Matt Hale trial has deserved assassination for a long time" has been deemed a sufficient solicitation or incitement to violence to withstand constitutional scrutiny. *United States v. White*, 610 F.3d 956, 957-58 (7th Cir. 2010).

These cases are illustrative of the principle that the Supreme Court announced in *Brandenburg v. Ohio* that "speech constitutes constitutionally proscribable incitement only if (1) the speaker possesses a specific intent to produce or incite others to imminent lawless action and (2) the speech is likely to have that effect." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969); *see also White*, 670 F.3d at 525 (4th Cir. 2012). In formulating the *Brandenburg* test, the Supreme Court relied on its prior decision in *Noto v. United States*, 367 U.S. 290, 298 (1961), where the Court drew a distinction between mere advocacy of ideas and incitement to unlawful action, stating "the teaching of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action."[3] The latter is the hallmark of "incitement" and fits squarely within the concepts of organization, promotion, encouragement, etc., including in subsection (b) of section 2102. Defendants' claims that the definitions in the Anti-Riot Act are void for vagueness are wrong and should be rejected.

Finally, Defendants argue that the Anti-Riot Act requires intent "only at the moment of travel" which then can "infect any subsequent actions." ECF No. 72, p. 13. Defendants' reading is simply incorrect and does not reflect any vagueness in the statue. The plain meaning of 18 U.S.C. § 2101 indicates that a defendant must "travel in interstate commerce (or use its facilities)

---

[3] *See also Dennis v. United States*, 341 U.S. 494, 545 (1951) ("Throughout our decisions there has recurred a distinction between the statement of an idea which may prompt its hearers to take unlawful action, and advocacy that such action be taken. The distinction has its root in the conception of the common law, supported by principles of morality, that a person who procures another to do an act is responsible for that act as though he had done it himself.").

Case 3:18-cr-00025-NKM-JCH   Document 79   Filed 03/08/19   Page 15 of 28   Pageid#: 452

with intent to follow one of the courses listed (A)-(D), each with 'a riot' as an objective." *Dellinger*, 472 F.2d at 393. The Seventh Circuit rightly found that "the statute surely does not require that the situation, nature, and details of the riot contemplated at the time of travel remain exactly identical until the time of the overt act, but does, we think, require that they be sufficiently similar so that it is reasonable to say the later is the same as or the evolving product of the one intended earlier." *Id.* at 393-94. In the related case of *Nat'l Mobilization Comm. To End War in Viet Nam v. Foran*, 411 F.2d 934, 938 (7th Cir. 1969), the Seventh Circuit noted that the Anti-Riot Act "does interdict riot-connected overt acts, but only if the prescribed intent is present when the interstate travel or use of interstate facilities occurs."

The District of Columbia District Court has found the same, that 18 U.S.C. § 2101 does not "authoriz[e] conviction where the unlawful intent and the prohibited act do not coincide." *United States v. Hoffman*, 334 F. Supp. 504, 509 (D.D.C. Nov. 23, 1971). The Northern District of California also confirms the language of the statute as requiring intent related to travel and subsequent overt acts performed with a substantially similar intent. *In re Shead*, 302 F. Supp. at 565 ("Congress has made it a crime if there is an intent to promote a riot at the time of use of interstate or foreign facilities and at that time or thereafter, the additionally-required overt acts are committed. This intent must be to promote, and the overt acts must be committed for the purpose of promoting, the disturbances defined in 18 U.S.C. § 2102(a)....").

### 3. *Defendants Do Not Present an As Applied Challenge, And For Good Reason*

Defendants offer only a facial vagueness challenge, despite the fact that *Holder* specifically precludes such an approach, because Defendants cannot meaningfully present an "as-applied" challenge. To withstand an "as applied" vagueness challenge, even where the First Amendment may be implicated, "perfect clarity and precise guidance have never been required...." *Holder*,

561 U.S. at 19 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008) (quotations omitted)). "A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person or ordinary intelligence fair notice of what is prohibited." *Holder*, 561 U.S. at 18. A court, in addressing an as-applied challenge, is to "consider whether a statute is vague as applied to the particular facts at issue" and shall not "consider[] the statute's application to facts not before it." *Id.* at 18-19. Even if a statute "may not be clear in every application . . . the dispositive point here is that the statutory terms are clear in their application to [defendant's] conduct." *Id.* at 21.

There is nothing vague about what conduct the Anti-Riot Act criminalizes or how the Defendants' conduct here falls within the ambit of the statute. As discussed above, the Anti-Riot Act does not preclude speech that does not involve incitement to violence or actual acts of violence. In this case, Defendants did not engage in speech only; rather, they engaged in documented, aggressive violent acts, which is precisely what they intended to do when they travelled to Charlottesville. Recall that Defendants came to Charlottesville with at least one specifically chosen "excellent fighter," not to make speeches or engage in a peaceful political march, but to "smash[] commies" and "beat antifa senseless."

It bears emphasis that Defendants mention nothing of these facts (or any other facts) of the case before the Court, but instead ask the Court to take judicial notice of facts from a different case that supposedly establish that the Unite the Right Rally was a political demonstration. As discussed in more detail below, it makes no difference whether the Unite the Right Rally was recognized by anyone as a political demonstration, because political demonstrations do not immunize their participants from crimes they commit while participating in such a demonstration.

17

In short, Defendants do not offer an "as applied' vagueness challenge because the facts of this case illustrate that the Anti-Riot Act is clear and criminalizes the exact behavior the Defendants carried out in Charlottesville in August 2017.

### B. The Anti-Riot Act is Not Overbroad and Does Not Run Afoul of the First Amendment

The Anti-Riot Act is not unconstitutionally overbroad nor does it run afoul of the First Amendment for many of the same reasons that it is also not void for vagueness, and Defendants do not mount a serious challenge here. In fact, every court to address whether the Anti-Riot Act offends the First Amendment has found that it does not. *See, e.g.*, *Dellinger*, 472 F.2d 340; *Hoffman*, 334 F. Supp. 504; *In re Shead*, 302 F. Supp. 560; *Foran*, 411 F.2d 934.[4]

The Supreme Court's First Amendment overbreadth doctrine provides that "a statute is facially invalid if it prohibits a substantial amount of protected speech. The doctrine seeks to strike a balance between competing social costs." *United States v. Williams*, 553 U.S. 285, 292 (2008) (citing *Virginia v. Hicks*, 539 U.S. 113, 119-20 (2003)). This balance, however, requires any overbreadth be "substantial" because [i]nvalidation for overbreadth is strong medicine not to be casually employed." *Williams*, 553 U.S. at 293 (quoting *Los Angeles Police Dept. v. United Reporting Publishing Corp.*, 528 U.S. 32, 39 (1999) (internal quotations omitted)). The Anti-Riot Act does not prohibit any protected speech, much less a "substantial" amount of protected speech as required by the Supreme Court. Accordingly, Defendants' overbreadth challenge fails.

As noted above, the Anti-Riot Act prohibits interstate travel (or the use of interstate instrumentalities) with unlawful riotous intent and performance of an overt act with a similar unlawful riotous intent. 18 U.S.C. §§ 2101-2102. The Anti-Riot Act, then, only criminalizes

---

[4] Defendants challenge the constitutionality of the Anti-Riot Act under an overbreadth heading as well as a First Amendment heading, but the analysis is one in the same and the government will address them as one.

violent action, threats of violence, or incitement to violence that constitute a clear and present danger to persons or property. *See Foran*, 411 F.2d at 939 ("Section 2101 does not proscribe the peaceful exercise of the rights of free speech and assembly."); *see also Dellinger*, 472 F.25 at 360 ("while a statutory prohibition of advocacy of violence is overbroad, since protected speech is included within advocacy, a prohibition of intentional incitement of violence is not overbroad" and holding that the Anti-Riot Act does not run afoul of the First Amendment); *In re Shead*, 302 F. Supp. at 566 (the conduct prohibited by the Anti-Riot Act is limited to "advocacy of the use of force or of law violation where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."); *Hoffman*, 334 F. Supp. at 509 ("the Court concludes that 18 U.S.C. § 2101 … [is] not violative of constitutional guarantees of free speech and assembly.").

Violence, incitement to violence, or threats of violence have never been afforded protection under the First Amendment. *See Dennis v. United States*, 341 U.S. 494 (1951); *Yates v. United States*, 354 U.S. 298 (1957); *Brandenburg v. Ohio*, 395 U.S. 444 (1969); *Chaplinksy v. New Hampshire*, 315 U.S. 568 (1942); *Watts v. United States*, 394 U.S. 705 (1969); *Virginia v. Black*, 538 U.S. 343 (2003). This Court has rightly recognized that "the *First Amendment* does not protect violence" and "so if the Defendants have formed or are engaged in a conspiracy against the public peace and order and thereby transcend the bounds of the freedom of speech which the Constitution protects, any law holding them liable for such conspiracy does not violate the *First Amendment*." *Sines v. Kessler*, 324 F. Supp. 3d 765, 801 (W.D. Va. July 9, 2018) (quoting *N.A.A.C.P. v Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982); *De Jonge v. State of Oregon*, 299 U.S. 353, 365 (1937)); *see also Brown v. Hartlage*, 456 U.S. 45, 55 (1982); *United States v. Amawi*, 695 F.3d 457, 482 (6th Cir. 2012).

Similarly, the Fourth Circuit has recognized that "it is axiomatic that violent acts are not accorded protection under the first amendment, even though they also constitute expressive or communicative conduct." *Abernathy v. Conroy*, 429 F.2d 1170, 1176 (4th Cir. 1970). Likewise, even "threats of violence are outside the First Amendment." *R.A.V. v. St. Paul*, 505 U.S. 377, 388 (1992).

Despite the abundance of case law holding threats of violence to be outside the protection of the First Amendment, Defendants nevertheless argue that the Anti-Riot Act "punishes a speaker for creating a likelihood of a *threat of conduct* that itself in turn creates a risk or danger of harm." ECF No. 72, pp. 16-17. It does not. Nothing in the Anti-Riot Act punishes "a likelihood of a threat of conduct," only acts of violence or threats of violence that present a clear and present danger. 18 U.S.C. § 2102(a). Defendants misread the plain language of the Anti-Riot Act, as well as the body of case law discussing the statute to create an "attenuation problem" that simply does not exist. And no court to analyze the Anti-Riot Act has found an attenuation problem. *See Dellinger*, 472 F.2d at 393; *Foran*, 411 F.2d at 938; *Hoffman*, 334 F. Supp. at 509; *In re Shead*, 302 F. Supp. at 565. That is because the Anti-Riot Act does not apply to "the mere oral or written advocacy of ideas or expression of belief, not involving advocacy of any act or acts of violence or assertion of the rightness of, or the right to commit, any such act or acts." 18 U.S.C. § 2102(b).

In effect, Defendants' attenuation argument is nothing more than a rebranding of its prior misplaced argument that the Anti-Riot Act does not require a conceptual or temporal link between the travel element and the overt acts. Defendants repackage their prior argument by claiming the statute lacks a "proximity requirement between the intent or overt acts and the riotous acts which may or may not follow later." ECF No. 72, p.17. For all of the reasons discussed above, Defendants' argument fails.

20

Defendants' most remarkable claim in their Motion to Dismiss is that the First Amendment does not apply "to disorders arising from political demonstrations" like those held in Charlottesville on August 11-12, 2017. ECF No. 72, p.18. But this Court, among others, has already correctly opined that the First Amendment does not "immunize[] them entirely" from the effects of their words or actions. *Sines*, 324 F. Supp.3d at 803. Defendants point to *United States v. Matthews*, 419 F.2d 1177 (D.C. Cir. 1969), to claim that Congress contemplated a difference between "mindless, insensate violence" and political demonstrations such as the October 21, 1967, anti-Viet Nam War march when it enacted the District of Columbia Riot Act several months prior to the Anti-Riot Act. ECF No. 72, p. 19. Defendants' argument is not supported by the language of the D.C. Riot Act, the Anti-Riot Act, or the D.C. Circuit's opinion in *Matthews*, and runs directly contrary to the entire body of First Amendment jurisprudence.

First, the plain language of the Anti-Riot Act and the D.C. Riot Act do not draw any distinctions between political demonstrations and any other type of demonstration or gathering of people. *See* 18 U.S.C. § 2102(a) (defining "riot" to include any "public disturbance" involving three or more persons); D.C. Code § 22-1322 (defining "riot" as any "public disturbance" involving five or more persons). Indeed, the only type of disturbance excluded from the reach of either statute is a private disturbance. *Id.*

Second, Defendants' description and analysis of *Matthews* is wrong and does not lead to any blanket rule that political demonstrations are not covered by the Anti-Riot Act. In upholding the constitutionality of the D.C. statute, the D.C. Circuit did not find the language of the statute ambiguous, but stated in *dicta* that "Congressional focus was, it is clear from the legislative history, upon mindless, insensate violence and destruction unredeemed by any social value and serving no legitimate need for political expression." *Matthews*, 419 F.2d at 1182. Notably, in 1967 when

Congress was contemplating the D.C. Riot Act as well as the Anti-Riot Act, the Supreme Court had not yet decided *Brandenburg* or *Watts*.

In *Brandenburg*, the Supreme Court invalidated an Ohio law that impermissibly criminalized "advocating violent means to effect political and economic change" without any element requiring incitement to imminent lawless action. 395 U.S. at 447-48. The facts in *Brandenburg* centered on speech by KKK members carrying weapons and advocating racist and anti-Semitic ideologies they hoped to spread during a march on Congress, to Florida, and to Mississippi. *Id.* at 446. In *Brandenburg*, the Supreme Court explicitly set forth the standard that governs today: laws that touch upon First Amendment rights may not criminalize speech without an element requiring a true threat, or an incitement to imminent lawless action. *See Watts*, 394 U.S. at 708 (recognizing in First Amendment doctrine the "background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials" so long as that "political hyperbole" does not rise to the level of a "true threat."). Indeed, as recently as 2008, the Supreme Court reiterated that its First Amendment jurisprudence "seeks to strike a balance between competing social costs" and will not render unconstitutional laws that are "directed at conduct so antisocial that [they] ha[ve] been made criminal" regardless of the setting. *Williams*, 553 U.S. at 292.

Defendants' attempts to infer an exclusion for all laws against rioting for political demonstrations runs contrary to the letter and spirit of the vast body of First Amendment jurisprudence, including this Court's clear statement in *Sines*, and Defendants' position makes no practical sense. *Sines*, 324 F. Supp.3d at 803. Taken to its logical end, Defendants' argument would make lawful any and all violence committed as part of, or incident to, any political

demonstration.  Such an expansive and nonsensical rule is not, and cannot be, the law.  Political demonstrations are not immune from criminal laws.

And as described above, Defendants here did not simply engage in political speech; they acted violently and now seek to shield themselves from their criminal acts with the First Amendment.  Defendants trained together in hand-to-hand and formation fighting techniques, attended other political rallies with the clearly expressed intent, in their own words, to "actually beat[] antifa senseless and win[] rallies" as well as "smashing commies."  Although their ideology is certainly relevant to their intent, Defendants here have been charged with crimes for engaging in physical battles, not ideological ones.

## C.  The Anti-Riot Act Falls Within Congressional Power under the Commerce Clause

Defendants' final constitutional challenge to the Anti-Riot Act focuses on the Commerce Clause and Defendants concede that "existing precedent affirms 'travel with intent' statues as valid constructions of commerce clause authority."  ECF No. 72, p. 21.  Nevertheless, Defendants seek reexamination of Congress' exercise of authority under the Commerce Clause because "the regulated conduct [here] is local in nature."  *Id.*   Defendants' argument is based on the faulty premise that the conduct only occurred in Virginia, but the conduct at issue in the present case began in California and Defendants utilized the instrumentalities of interstate commerce with riotous intent, which culminated in their travel to Virginia, where they committed overt, criminal acts.  The criminal acts committed in this case, then, did not occur "wholly within a State" as Defendants contend.  *Id.*

Furthermore, the statute does not exceed Congress' commerce clause power because it regulates persons travelling in interstate commerce for specified unlawful purposes.  *See United States v. Orito*, 413 U.S. 139, 143 (1979) (concluding that Congress may regulate the

transportation of obscene material across state lines, even if by private vehicle for the private use of the transporter); *Cleveland v. United States*, 329 U.S. 14, 17 (1946) (holding that "[t]he power of Congress over the instrumentalities of interstate commerce is plenary; it may be used to defeat what are deemed to be immoral practices; and the fact that the means used may have the quality of policer regulations is not consequential with regard to Congress's ability to regulate interstate travel for purposes of polygamy); *United States v. Simpson*, 252 U.S. 465 (1920) (upholding Congress' power to regulate the transportation of alcohol in interstate commerce into a state prohibiting the manufacture or sale of alcohol even when the statute was applied to the transportation of five quarts of whiskey in a private automobile for personal consumption); *Hoke v. United States*, 227 U.S. 308, 320–21 (1913) (affirming constitutionality of the Mann Act, which prohibited the movement of persons across state lines for the purpose of engaging in prostitution); *see also Hoffman*, 334 F. Supp. at 509 (upholding 18 U.S.C. § 2101).  Defendants' commerce clause argument is without merit and should be rejected outright.

III.    **The Conspiracy Alleged in Count One Does Not Violate Wharton's Rule and Is Sufficient**

A.  *Count One Does Not Violate Wharton's Rule*

Under Wharton's Rule, "an agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission."  *Iannelli v. United States*, 420 U.S. 770, 774 n.5 (1975); *see also United States v. Rashwan*, 328 F.3d 160 (4th Cir. 2003).  Wharton's Rule does not apply where a crime can be committed by just one person.  *Rashwan*, 328 F.3d at 164 (citing *United States v. Spitler*, 800 F.2d 1267, 176-77 n.5 (4th Cir. 1986).

Wharton's Rule does not apply here.  The Anti-Riot Act can be violated by just one person and that is clear from the plain (and singular) language of the statute: "Whoever travels…." 18

24

U.S.C. § 2101(a). While the statute provides that a riot occurs only when there is a public disturbance including at least three or more people, at least one of whom engages in an act of violence or threat of violence, nothing in the statute requires that assemblage of persons to work together for a common purpose or be in agreement with one another to complete the prohibited act. *See* 18 U.S.C. §§ 2101, 2102. For example, in this case, the assemblage of three or more persons required to satisfy the term "riot" need not have been three other RAM members engaged in a public disturbance, but could include (and did include in this case) numerous counter protesters. No one, including Defendants in this case, would contend that counter protesters and Defendants "conspired" to riot together. And this makes perfect sense because the essence of conspiracy is "an *agreement* to commit an unlawful act." *Iannelli*, 420 U.S. at 777 (emphasis added).

Moreover, the "third party exception" to Wharton's Rule applies in the instant case. "[C]ourts have specifically exempted from Wharton's Rule conspiracies that involve more people than are required for commission of the substantive offense." *Rashawn*, 328 F.3d at 164. "Wharton's Rule is aimed at crimes where the parties to the agreement are the only persons who participate in the commission of the substantive offense, and the immediate consequences of the crime rest on the parties themselves rather than on society at large." *Rashwan*, 328 F.3d at 164 (quoting *Iannelli*, 420 U.S. at 782-83) (quotations omitted)). Here, the conspiracy alleged involves more than those required for the offense, and the consequences of the crime falls not just on Defendants, but on others who are either part of the assemblage or subject to the clear and present danger presented. Accordingly, Wharton's Rule does not apply.

Case 3:18-cr-00025-NKM-JCH   Document 79   Filed 03/08/19   Page 25 of 28   Pageid#: 462

B.  *The Indictment Sufficiently Alleges a Conspiracy*

Defendants' final argument alleges that the indictment does not sufficiently allege that Defendants entered into an agreement to violate 18 U.S.C. § 2101.  ECF No. 72, p. 24.  Paragraph 9 of the indictment, however, specifically alleges that Defendants "did knowingly and willfully conspire, combine confederate and agree … to commit an offense against the United States, namely: traveling in interstate commerce and using a  facility of interstate commerce with intent … and thereafter performed and attempted to perform any other overt act for such purpose…."  ECF No. 8, ¶ 9.   Paragraph 10 of the indictment then lists some 15 overt acts Defendants committed in furtherance of the conspiracy.  One is hard pressed to contemplate that paragraphs 9 and 10 do not satisfy the standard of a "plain, concise, and definite written statement of the essential facts constituting the offense charged…."  Fed. R. Cr. P. 7(c)(1).

Defendants' challenge is more properly characterized as a pre-trial challenge to the sufficiency of the evidence rather than an insufficient indictment.  Courts have been clear, however, that "it is incorrect to require . . . that the indictment must enumerate every possible legal and factual theory of defendants' guilt."  *American Waste Fibers Co*., 809 F.2d at 1047.  For the same reasons as stated above and because the language of the indictment here is clear and unequivocal in alleging that Defendants entered into an agreement to violate the Anti-Riot Act, Defendants' sufficiency challenge to Count One fails.

## Conclusion

Despite a robust attempt to characterize their actions as protected political speech, Defendants arguments are not supported by the facts of this case or by the law.  Participation in a political rally does not grant individuals license to engage in mayhem.  Far from a peaceful

gathering to express their views, Defendants in this case engaged in a pattern of engaging in physical violence against their perceived political foes.

The First Amendment does not, and has never, protected incitement to violence or violent actions. The Anti-Riot Act lawfully criminalizes precisely the sort of conduct at issue in this case, conduct that falls well outside the protection of the First Amendment. There is nothing vague or overbroad about the Anti-Riot Act, and it has withstood constitutional scrutiny by every court that has addressed it.

Finally, there is no merit to Defendants' Commerce Clause arguments, nor does Wharton's Rule apply in this case. Defendants' Motion to Dismiss should be denied.

Respectfully submitted,


THOMAS T. CULLEN
United States Attorney

Date: <u>March 8, 2019</u>

*/s/ Justin Lugar*
Justin Lugar (VA Bar No. 77007)
Chris Kavanaugh (VA Bar No. 73093)
United States Attorney's Office
255 W. Main Street
Charlottesville, VA 22902
434-293-4283
E-mail: justin.lugar@usdoj.gov

27

## CERTIFICATE OF SERVICE

I hereby certify that on March 8, 2019, a true copy of the foregoing Response of the

United States has been filed with the Clerk of Court using the CM/ECF system, which will

provide electronic notice to all counsel of record.

/s/ *Justin M. Lugar*

Justin Lugar
Assistant United States Attorney
Virginia State Bar No. 77007
P. O. Box 1709
Roanoke, VA  24008-1709
Telephone: (540) 857-2250
Facsimile: (540) 857-2283
E-mail:  justin.lugar@usdoj.gov