IN THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| | ) | |
| V. | ) | Case No. 3:18-cr-00025-002 |
| | ) | |
| | ) | **SENTENCING MEMORANDUM** |
| | ) | |
| MICHAEL PAUL MISELIS, | ) | |
| Defendant | ) | |

### Defendant's Sentencing Memorandum

**COMES NOW**, the defendant, Michael Paul Miselis (hereinafter, "Mr. Miselis" or "defendant Miselis"), by counsel, and respectfully submits the following sentencing memorandum:

1. **The Law**

The Court must still consider the sentencing guidelines, but under <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Guidelines are "merely one sentencing factor among many, and the calculated guideline range must be considered in conjunction

with the other §3533(a) factors."[1] The Guidelines do not have "quasi-mandatory status."[2] The federal sentencing statute requires a "sentence sufficient, but not greater than necessary" to meet certain goals, including consideration of "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant ... (3) the kinds of sentences available ... (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense."

To comply with the 4th Circuit's instructions in United States v. Carter, 564 F.3d 325, 328 (4th Cir. 2009)(citations omitted), this Court,

> must apply the relevant §3553(a) factors to the specific circumstances of the case before it. Such individualized treatment is necessary to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue...[W]here the defendant...presents nonfrivolous reasons for imposing a different sentence [than the Guidelines] a district judge should address the party's arguments and explain why he has rejected those arguments.

The Government is seeking an enhancement to the Guidelines because of the

---

[1] United States v. Reinhart, 442 F.3d 857, 864 (5th Cir. 2006), cert. denied, 127 S. Ct. 131 (2006)(citing United States v. Booker, 125 S. Ct. at 756-757).
[2] United States v. Reinhart, 442 F.3d at 864.

alleged hate crime motivation of Mr. Miselis in committing the instant offense. This enhancement is governed by USSG §3A1.1(a), which states:

> If the finder of fact at trial, or, in the case of a plea of guilty or *nolo contendre*, the court at sentencing determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of any person, increase by **3** levels.

(emphasis in the original).

### 2. Applying the Factors of 18 USC §3553(a) to Michael Miselis

### A. The History and Characteristics of the Defendant.

Michael Miselis was born in 1988 in Stockton, California, to Dr. Kenneth Miselis and A. Judy Miselis. Dr. Miselis is an ophthalmologist and founded Heritage Eye, Skin, and Laser Center ("Heritage") in Stockton, California. Judy Miselis is a registered nurse and works with Dr. Miselis at Heritage. Mr. Miselis has one half-brother, two-half sisters, and one sister. There is a substantial age difference in the siblings and Mr. Miselis was the youngest child of all of the siblings and half-siblings.

Mr. Miselis had a difficult birth. He was strangled by his umbilical cord and his collarbone was broken. Despite this difficult beginning, Mr. Miselis worked very hard to succeed in his education. He graduated from Tokay High School in Lodi, California, where he was one of the top students, graduating with a 4.5 grade point average. He was also involved in extracurricular activities and volunteer work. Inspired by his father, he obtained a private pilot's license while still in high school.

Mr. Miselis performed well on his college entrance examinations and entered the engineering program at U.C.L.A., one of the top programs in the country. Mr. Miselis completed the academically rigorous program in 4 years, rather than the customary 4 ½ years. Mr. Miselis's social life was proscribed due to the rigors of his academic program. Mr. Miselis received his B.A. in Aerospace Engineering in 2010. Mr. Miselis had difficulty finding work as an engineer because of the Great Recession and decided to enter graduate school in the field of Aerospace Engineering.

After receiving his Master's Degree in Aerospace Engineering, Mr. Miselis decided to enter the Ph.D. program. While in the program, Mr. Miselis served as propulsion lead for the UCLA Rocket Project/Hybrid Propulsion Experiment (HyPE). Mr. Miselis passed his Ph.D. preliminary examinations and later presented his prospectus to a panel of professors and was advanced to Ph.D. candidacy. He was engaged in research in the program until he was arrested for these charges. Also, before he left the program, Mr. Miselis presented a research paper at a professional conference in Washington, D.C.

While pursuing his doctoral studies, Mr. Miselis applied with Northup Grumman and was offered a position as Mission Assurance Engineer I in March 2013. In September 2015, Mr. Miselis was promoted to Mission Assurance Engineer II and later, in June 2016, was promoted to Modeling and Simulation Analyst. In this position, he computationally modelled airborne platforms and systems and ran simulations of air-to-air and air-to-ground combat. Mr. Miselis was granted a top-secret clearance while working in this position. As he was directed to do, Mr. Miselis fully informed his security manager at Northup Grumman about all his foreign travel,

including the countries visited and dates. Mr. Miselis was terminated from this position because of the notoriety from the instant charges. A copy of Mr. Miselis's most recent curriculum vitae is attached and incorporated by reference.

Mr. Miselis has a spotless criminal record and has never been arrested for a crime until the charges before this Court. As stated, he endured a rigorous character investigation when he was granted a top-secret clearance.

Although he excelled academically and in his career, Mr. Miselis is a shy individual who has difficulty in social situations. He has been described by his parents as socially inept. Also, due to the demanding nature of his studies, he had few opportunities to form close friendships over the years until he met the co-defendants in Huntington Beach, California, in 2017. It was then that his life took a U-turn that was at odds with everything that he had done before.

**B. Acceptance of Responsibility**

Counsel agrees with the finding of the U.S. Probation Office that Mr. Miselis has clearly demonstrated acceptance of responsibility for the offense of conviction and pursuant to USSG §3E1.1(b) has properly earned a three-point reduction in the offense level. As noted in the Presentence Investigation Report (hereinafter "PSIR"), this is based upon the defendant's statements to the probation officer as well as statements in open court at the entry of the guilty plea on May 3, 2019. Counsel would also note that Mr. Miselis has agreed to the accuracy of the Government's Statement of Offense that describes his role. This proffer of evidence is now part of the record, having been admitted at the hearing on May 3, 2019.

## C. The Nature and Circumstances of the Offense

The Riot-Act is a non-guideline offense and there is very little sentencing history to provide guidance to the Court on the seriousness of the offense and which sentence would constitute a just punishment. The parties have stipulated to the analogous offense of aggravated assault for purposes of the sentencing guidelines but the two offense diverge to such a degree that sentences for the analogous offense provide little, if any, guidance for the Court's decision. Without such resources to call on, the circumstances of the offense and the conduct of each defendant takes on a paramount importance for the Court's evaluation of the factors set forth in 18 USC §3553(a)(2)(A) in its determination of Mr. Miselis's sentence.

One of the factors the Court should consider is Mr. Miselis's role in the offense.[3] Mr. Miselis was not one of the planners or leaders of the Rise Above Movement ("RAM"). Mr. Miselis only began training with RAM after the events of Huntington Beach, California, in 2017. There is no evidence that Mr. Miselis organized training for RAM or planned travel for the group to Berkeley, California, or Charlottesville, Virginia.

If there was a leader of RAM, it was Benjamin Daley and not Mr. Miselis. There are numerous instances cited in the PSIR of Mr. Daley assuming the leadership role in RAM. For example, Mr. Daley helped to organize a RAM training on April 9, 2017, and Mr. Daley used his ATM card to purchase athletic tape for the RAM members to wrap their hands and told them to "[m]ake sure to not use your card. Hit the ATM and use cash." Finally, the PSIR itself points to Mr. Daley's role as an "organizer/leader." It is

---

[3] See USSG §3B1.2.

uncontested, and the evidence establishes, that Mr. Miselis was a follower and not a leader of RAM.

According to the PSIR, Mr. Miselis committed two acts of violence in Charlottesville. While he is in no way trying to evade responsibility for the seriousness of his actions or his part in them, it is important to closely scrutinize the circumstances in order to properly evaluate his role in the offense. On August 12, 2017, the co-defendants were directed by the police to an area where they were surrounded by counter-protesters and a melee erupted. There were two incidents of violence by Mr. Miselis during this fracas that are documented in the PSIR: (1) Mr. Miselis appeared to shove an African-American male to the ground and then struck him, and (2) Mr. Miselis kicked a white male that was falling to the ground. Although there were other minor incidents, the evidence shows that there are only two incidents of violence by Mr. Miselis in Charlottesville on August 11-12, 2017. Again, while he concedes that he engaged in these actions, it is important to focus on his culpability when crafting an appropriate sentence.

USSG §5k2.20 provides in relevant part that his Court can make a downward departure if there was no significant planning, [the violent act] was of limited duration, and it represents a marked deviation by the defendant from an otherwise law-abiding life. While Mr. Miselis might not qualify for a formal downward departure under these guidelines, the factors listed in this section are still factors that the Court can consider under the Guidelines. As stated previously, Mr. Miselis was not involved in the planning of the offense, he was a follower and not a leader. Also, there were two incidents of

violence within a few minutes. Finally, and most markedly, other than the instant offense, Mr. Miselis has been law-abiding his entire life.

**D. The Need for the Sentence Imposed**

1) To Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

A sentence with minimal prison time and below the suggested guideline range in this case will reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. Other than this offense, Mr. Miselis has led a blameless life. He worked very hard for his academic and professional achievements. He was months away from receiving his Ph.D. in Aerospace Engineering from U.C.L.A. and embarking on a promising career. No matter the sentence imposed by this Court, his career is in tatters. It is highly doubtful that he will be able to work in his chosen career field. It is unlikely that he will be ever again be granted a security clearance, a necessity for his career field. Also, any human resources office will associate Mr. Miselis, unfairly or not, with the violence that occurred in Charlottesville in August 11-12, 2017, and be unlikely to give him a favorable recommendation to forward his application. Also, throughout his academic and professional career, Mr. Miselis has worked closely with a highly diverse range of professionals. Again, the information on the internet, some of it highly inaccurate and with unfair depictions of Mr. Miselis, will make it difficult for Mr. Miselis to cultivate and maintain the collegial relationships that he has enjoyed heretofore, which is an absolute necessity for an engineer in the high-tech world. Indeed, it is not known whether he will be allowed to complete his Ph.D if, and when, he is able to return to U.C.L.A. or another graduate program.

In short, no one who is in any way familiar with Mr. Miselis's circumstances could conclude that he escaped punishment, even if the Court were to impose a minimal sentence. Given the heights to which he worked hard to reach, and the depths to which he has fallen, a lengthy sentence would not promote respect for the law but only demonstrate the awesome power the Government has in deciding a sentence regardless of individual culpability and circumstances.

2). To Afford Adequate Deterrence to Criminal Conduct.

Again, to anyone who is contemplating criminal acts, Mr. Miselis's downfall, regardless of the prison sentence, would militate against such planned conduct. While few potential criminals have obtained the laurels for which Mr. Miselis has devoted countless hours, they can appreciate the amount of work and the years of devotion by Mr. Miselis, all for naught. No sane person would think that Mr. Miselis "got off lightly" with a minimal sentence. Given everything that he worked so hard to attain, and has lost, a lengthy prison sentence would be mere surplusage when it comes to deterrence of criminal conduct by others. Indeed, anyone reflecting on Mr. Miselis's sentence would not just conclude that he has lost a great deal through his own actions but, also, that society has suffered a loss. Mr. Miselis was engaged in top-secret defense work to make the nation safer. It is a tragedy and loss to the nation that someone with his unique skills will be unable to devote those skills to the security and safety of our country. Again, Mr. Miselis's case provides an abject lesson for all and further punishment is not called for to achieve the goal of deterrence.

3). To Protect the Public from Further Crimes by Mr. Miselis

A guideline sentence of 21-27 months, or as the Government requested, 30-37 months, is wholly unnecessary to protect the public from future crimes, especially considering that Mr. Miselis has zero criminal history points. He, thus, poses the lowest possible risk of recidivism and creates the lowest possible need to protect the citizenry under 18 USC §§3553(a)(2)(B) and 3553(a)(2)(C). Indeed, as an offender without a single criminal history point, he presents only a little more than 10% risk of recidivism in the first 24 months after release; by contrast, the other offenders in his criminal history category (those with one criminal history point) have twice his recidivism rate.[4] Other than the wildly variant recidivism statistics among offenders in Category Six, the increase in recidivism rates after offenders acquire their first criminal history point represents the single steepest increase in recidivism accompanying the addition of a single criminal history point.[5] It thus cannot be said that a Guideline sentence, which assumes a rough equivalence between his risk of recidivism and that of offenders with a single criminal history point, adequately accounts for his extremely low risk of recidivism.

4) To Provide Michael Miselis with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner.

As stated previously, Michael Miselis has passed his Ph.D preliminary examinations and has been accepted into candidacy for the Aerospace Engineering program at U.C.L.A. Consequently, Mr. Miselis is not in in need of any particular

---

[4] See U.S. Sentencing Commission, *A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score*, at 5 (2005)("scoring at the minimum value of zero on the CHC indicates a very low recidivism risk.").

[5] See U.S. Sentencing Commission, Measuring Recidivism, at 7 (2004).

educational or vocational training. If anything, a lengthy prison sentence will only serve to further harm his chances of obtaining his Ph.D. because of the length of time between credit hours. Customarily, most graduate programs must be completed with a certain amount of time and this needless delay will severely hamper his ability to complete his program within the proscribed time period.

Moreover, Mr. Miselis is not in need of medical or drug treatment. Mr. Miselis is in good health and there have been no allegations of drug use. Any sentence the Court considers should take into account the fact that Mr. Miselis will not qualify for the Residential Drug Abuse Program because he has never abused drugs or alcohol. As such, Mr. Miselis is not eligible for a one-year reduction of his sentence. So, in essence, Mr. Miselis is facing greater punishment than a person in the same circumstances who has abused illegal or prescription drugs. Such a result is surely inequitable.

5) The Need to Provide Restitution for the Victims.

According to the PSIR, the victims have not yet submitted requests for restitution so it is not known whether Mr. Miselis will be ordered to pay restitution or what amount. However, of the defendants, the one person who has any chance of paying substantial restitution is Mr. Miselis. As earlier discussed, if Mr. Miselis is able to resume his studies in a timely fashion, it is possible that he could still obtain his Ph.D. in Aerospace Engineering and resume a career, even if it is not in his chosen field. In such circumstances, Mr. Miselis may be able to earn enough money to pay restitution, something that seems unlikely for his co-defendants. A lengthy prison sentence for Mr. Miselis will only hamper the ability of victims to receive any court-ordered restitution.

### 3. The Government has Failed to Meet its Evidentiary Burden to Prove a Hate Crime Motivation by Mr. Miselis

The Government is seeking to enhance Mr. Miselis's offense level by 3 points under USSG §3A1.1(a), which provides for such enhancement if there was a hate crime motivation in committing the offense. In order to impose this enhancement, the Court must find beyond a reasonable doubt that the defendant selected the victim because of one of the prohibited bases. The Government has failed to meet its evidentiary burden and, accordingly, the Court should not find that the enhancement is appropriate for Mr. Miselis.

According to the PSIR, and the evidence provided to defense counsel by the Government, there were distinct incidents of ciolence by Mr. Miselis against two individuals. One individual was a white male and the other was an African-American male. It is not known, and there was certainly no evidence cited in the PSIR or provided in discovery to the defense counsel, as to whether the white male possessed one of the prohibited characteristics listed in USSG §3A1.1(a). The other victim was African-American but there is absolutely no evidence that Mr. Miselis was motivated by racial animus in selecting that individual. So, the Government has failed to produce any evidence that Mr. Miselis selected any individuals for violence based upon a racial, religious, or prohibited characteristics listed in the Guidelines. It is abundantly clear that, to the extent that Mr. Miselis did any selection, it was solely based upon the fact that the individuals were counter-protesters blocking his egress.

The Government has produced evidence that Mr. Miselis may have made some unsavory comments at an indistinct time before the actions in Charlottesville on August

11-12, 2017, that had nothing to do with the characteristics of the victims of the violence committed at that time and place. In the Government's Objections to Presentence Investigative Reports, the Government argues that §3A1.1(a) enhancement is appropriate but, as to Mr. Miselis, there is no evidence that his attacks were based upon one of the prohibited characteristics, other than a conclusory statement that "the defendant [Mr. Miselis] view his enemies as "Jews." There is no evidence to support this contention and certainly no evidence that Mr. Miselis attacked anyone because he believed them to be Jewish.

In the PSIR, there are two incidents that are supposed evidence of Mr. Miselis's alleged Jewish animus. First, Mr. Miselis and his co-defendants were standing behind a sign that said, "Da Goyim Know", which allegedly refers to a Jewish conspiracy to control world affairs. First, it is not explained how these 3 words relate to a Jewish conspiracy and there is absolutely no evidence showing that standing behind a sign clearly meant to annoy counter-protesters is evidence of a hate crime motivation to commit violence. Also, there is a doctored photo showing a "Star of David" over the white male that Mr. Miselis kicked in Charlottesville on August 12, 2017. Obviously, the image was doctored after the event. There is no evidence that Mr. Miselis doctored the photo himself or approved of it. The only evidence cited by the Government is that the photo was found on Mr. Miselis's cell phone. Again, the doctored photo provides no evidence of Mr. Miselis's alleged Jewish animus.

The Government has utterly failed to link its scanty evidence of Mr. Miselis's alleged Jewish animus with his motivation for selecting victims of the offense for which he pled guilty. Even if, assuming *arguendo*, that Mr. Miselis had made racist anti-

semitic remarks, there must be some relationship between the remarks and the victims selected by Mr. Miselis. First, the Government has not established any temporal relationship between the alleged remarks or conduct and the actual violence. It is unknown when and where these alleged remarks or actions were made. It is unknown when and where these alleged remarks or actions were made. It is not known how much time passed between the remarks or actions and before or after the offenses. In examining the alleged evidence of motivation, it is important to show that there is a close temporal relationship between the remarks and offenses. No such showing has been made by the Government.

Most importantly, there is absolutely no relationship between the supposed anti-semitic remarks and conduct and the victims of the offense. The victims appear to have been counter-protesters but there has been no evidence provided by the Government that the victims were either Jewish or perceived by Mr. Miselis to be be Jewish. It cannot be said that Mr. Miselis possessed such motivation if the actual offense was committed against victims that were not Jewish. It is possible, of course, that one of the victims may have been Jewish but there is no evidence that Mr. Miselis would have known that and, accordingly, did not serve as motivation for the violence.

The Government is seeking a substantial enhancement to Mr. Miselis's offense level because, at some time before or after the events in Charlottesville, he may have made offensive remarks and is now seeking to punish him for those remarks. Obviously, they cannot use the enhancement as a back-door method to punish First Amendment protected speech. The Government has an evidentiary burden to prove that such speech proved beyond a reasonable doubt that the motivation for the instant

offense was out of animus for one of the protected groups listed in §3A1.1(a). The Government has not met its burden because no such motivation existed and, therefore, the Court should decline to find the requested enhancement for Mr. Miselis.

**4)   Appropriate Sentence**

Before crafting an appropriate sentence, the Court must first determine the appropriate offense level under the Guidelines. As stipulated in Mr. Miselis's Plea Agreement, the appropriate offense level for Mr. Miselis's conduct was 19, with a 3-point reduction for a timely and clearly demonstrated acceptance of responsibility. As stated, the Government intends to argue that Mr. Miselis should receive a 3-point enhancement for a hate crime motivation. As shown above, the Government has failed to meet its evidentiary burden to prove the hate crime motivation beyond a reasonable doubt. Therefore, the Court should reject this enhancement and find that Mr. Miselis's offense level for sentencing under the Guidelines is 16. As Mr. Miselis has a spotless criminal record, his Criminal History Category is I. Accordingly, the correct Guideline range for Mr. Miselis is 21-27 months.

Based upon all the §3553(a) factors discussed above, Counsel requests a downward departure from the recommended Guideline sentence of 21-27 months. The basis for this request is the great weight of mitigating evidence discussed above. Mr. Miselis has led an exemplary life until the offense at bar. Also, he has worked very hard for years to obtain academic and career success and made significant contributions to our nation's defense. Unfortunately, he made some uncharacteristically bad decisions and finds himself before this Court for sentencing. Although he admits his mistakes and accepts full responsibility, Mr. Miselis asks the Court to consider his role in the offense,

which was that of a follower who was not involved in planning. Finally, Mr. Miselis asks the Court to consider what he has lost already because of his admittedly bad decisions. He will probably not be able to work in his chosen career field, despite years of dedication. Combined with the notoriety of the offense, Mr. Miselis has already lost more than any of his co-defendants and Mr. Miselis respectfully requests that the Court consider this unique loss when crafting an appropriate sentence. For these reasons, Counsel urges the Court to fashion a sentence in the range of 18-21 months, which is a sentence sufficient but not greater than necessary to satisfy the goals of sentencing.

## 5) Witnesses

Mr. Miselis intends to call A. Judy Miselis, his mother, as a witness at the sentencing hearing. Mr. Miselis reserves the right to testify at the sentencing hearing and to allocate before the Court prior to imposition of sentence.

**WHEREFORE**, the defendant respectfully requests that the Court take into account the facts and arguments set forth above in arriving at an appropriate sentence in this case.

Respectfully Submitted,

MICHAEL PAUL MISELIS

S/Warren Cox
By:_____
Of Counsel

Warren Cox, VA Bar #33712

genecox@coxfedlaw.com

308 W. Spotswood Ave.

Elkton, VA 22827

(540) 742-5385 phone

(540) 779-0609 fax

## CERTIFICATE OF SERVICE

I hereby certify that on 15th day of July 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that will send notification of such filing to the counsel of record.

S/Warren Cox

By:_____

Of Counsel

Warren Cox, VA Bar #33712

genecox@coxfedlaw.com

308 W. Spotswood Ave.

Elkton, VA 22827

(540) 742-5385 phone

(540) 779-0609 fax