**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No.   3:18-CR-00025 (NKM)** |
| | : | |
| **v.** | : | |
| | : | |
| **BENJAMIN DRAKE DALEY** | : | |
| **MICHAEL PAUL MISELIS** | : | |
| **THOMAS WALTER GILLEN** | : | |

_____

### SENTENCING MEMORANDUM OF THE UNITED STATES

The three defendants, Benjamin Daley, Michael Miselis, and Thomas Gillen were all prominent members of the Rise Above Movement, a southern California-based white supremacist organization that traveled to Charlottesville to commit acts of violence in connection with the "Unite the Right" rally.   The government submits this memorandum in support of the United States Probation Office's application of the hate crime motivation enhancement pursuant to U.S.S.G § 3A1.1(a) and in support of the following sentences as to each defendant:

- As to Defendant **Benjamin Daley**, a term of 42 months' imprisonment followed by a term of three years' supervised release.

- As to Defendant **Michael Miselis**, a term of 30 months' imprisonment, followed by a term of three years' supervised release.

- As to Defendant **Thomas Gillen**, a term of 46 months' imprisonment, followed by a term of three years' supervised release.

For the reasons discussed below, and for those to be cited at the defendants' sentencing hearings, this Court should apply the hate crime motivation enhancement under § 3A1.1.   And, in any event, upon consideration of the Section 3553(a) factors, the Court should impose these terms of incarceration.

# I.  SUMMARY OF THE FACTS

In early 2017, the three defendants – Benjamin Daley, Michael Miselis, and Thomas Gillen – and other individuals were members of organization originally known as the "DIY Division" that was later re-branded as the "Rise Above Movement" or "RAM."   RAM was located in the greater Los Angeles, California area and represented itself as a combat-ready, militant group of a new nationalist white supremacy and identity movement.   RAM regularly held hand-to-hand and other combat training for its members and associates to prepare to engage in violent confrontations with protestors and other individuals at purported political rallies.   All three of the defendants attended these trainings to prepare for their violence.

RAM's goal when they attended these rallies was simple:   They sought to provoke physical conflict, or – even better – they looked for any reason to serve as an excuse which they believed would justify their use of violence against their ideological foes.   RAM had an effective social media campaign, using Instagram, Twitter, Facebook, and Gab, and sought to recruit new members through this online presence.   RAM would publicly post photographs of its members with their faces partially concealed.



These photographs would often be accompanied by statements such as "When the squad[']s not out smashing commies" and "#rightwingdeathsquad" and #ultraright.

Contrary to many white supremacist groups, RAM's image and its membership were calculated to make their more incendiary racist and anti-Semitic views appeal to the mainstream right-wing and alt-right sympathizers with the goal of later indoctrinating new recruits. Daley, as a founding member, told a potential RAM recruit that he could not have a shaved head because "[w]e go for the implicit look" and "the 80s in that style of nationalism proved to be ineffective." *Analysis* of *Facebook Search Warrant of Ben Daly* at 24.

RAM members also sought to infiltrate traditional and mainstream conservative groups, conceal their extremist views, and indoctrinate (or "red-pill") them.[1] For example, when an individual contacted Daley on whether any RAM groups were in his area, Daley told him that "We are not branching out but we do heav[il]y encourage our style of networking and activism. . . . if the[y] have trump or maga events out where you are definitely go. Good place to meet people. Also can have guys get in with the college republicans." *Id.* The goal of meeting these people at MAGA events was to "conceal your power level [i.e. extremist views]" and "maintain implicitness." To Daley, he believed "[e]xplicit symbols are unnecessary and off-putting to the maga bros that can be recruited and red pilled."

**A. Huntington Beach, California on March 25, 2017.**

On March 25, 2017, Daley and Gillen attended a purported political rally in Huntington Beach, California, along with other RAM members, where they met Michael Miselis and exchanged contact information with him. That morning, Daley texted a female associate that he was planning to go to Huntington Beach to march, and adding "[F]uck these Jews." Also prior to

---

1 The term "red-pill" is a term frequently used in the white supremacist community to mean to convince another of the "truth" of their extremist views (*i.e.,* the superiority of the white race, the inferiority of other racial and ethnic groups, or the truth about a Jewish-led conspiracy to control world affairs and to eliminate the white race). The term is the derived from a scene in the movie "The Matrix" in which the lead character is offered a red pill to learn the truth about the world's current status.

this rally, Daley painted a sign (which RAM would use again at Berkeley) that stated "Da Goyim Know," a reference to their supposed knowledge of a Jewish conspiracy to control world affairs and eliminate the white race.   Daley took a photo of himself with the sign, depicted below.



At that event, several RAM members pursued and assaulted groups of protestors and other persons. Following the rally, photographs depicting this violence by RAM members were covered on the news and on the "front page" of various Neo-Nazi, white supremacist websites.   The following is one photograph of RAM co-founder Robert Rundo that was prominently featured:



RAM members celebrated this coverage, and used the Internet to post statements,

photographs, and videos of assaults committed by RAM members at this rally in order to recruit members to engage in violent confrontations at future events.    For example, on the evening after the rally, Daley sent a text message to fellow RAM members and potential recruits, including Miselis: "Front page of [website] we did it fam."   Miselis replied:   "Celebrity status . . . .well done."   In referencing these events at Huntington Beach, the RAM Twitter account later posted the following photograph showing several RAM members, including defendants Daley and Gillen, at the event, with the message, "Shortly after this pic antifa was btfo [i.e., blown the f—k out] in Huntington Beach."



## B.  Berkeley Riots on April 15, 2017

In early 2017, a purported political rally was scheduled to occur in Martin Luther King Jr. Civic Center Park in Berkeley, California.    Fresh off their "victory" in Huntington Beach and looking for their next opportunity to make a name for themselves, RAM (with Daley and co-founder Robert Rundo as leaders) planned a combat training session on Sunday, April 9, 2017, in San Clemente, California, the weekend before the rally.   Having exchanged information just a few weeks before, Daley invited Miselis to join.   One of the subjects of focus would be "hand to hand fighting and formation fighting."   All three defendants attended.

On April 14, 2017, Daley, using a debit card, reserved and rented a van from Airport Van

Rentals located at the Los Angeles International Airport to transport the defendants and other RAM members from southern California to Berkeley, California. Daley had not yet reached the age of 25, so although the phone number on the reservation and the debit card to pay were his, he had a fellow (older) RAM member use his name on the reservation. On the evening of Friday, April 14, 2017, the defendant met with eight other RAM members who then traveled to Berkeley, California in the van. This photograph is taken from the trip, with all of the RAM members in the van making the "white power" sign with their hands.



Daley is in the front passenger seats, and Miselis and Gillen are in the second and third rows, respectively.

On April 15, 2017, several hundred people – to include the defendants and the other RAM members – attended the rally. Here, prior to any violence, Daley, Miselis, Gillen, and others are holding a "Defend America" and "Da Goyim Know" banners.



Daley, Miselis, and Gillen and other RAM members were dressed in gray clothing, goggles, and a black scarfs or masks to cover the lower half of their faces. For example, Daley can be seen in the below photograph wearing his skull mask and holding a bagel in one hand, a reference to Jewish culture, and a white power sign with the other.



Wearing these same skull masks, the defendants were captured in photographs stealing the banner of a female counter-protestor, depicted below.



Throughout the day, there were several violent clashes between some rally attendees and individuals protesting the rally. In one of the first such instances, RAM members, including the defendants, crossed the police barrier separating the attendees and protestors, and assaulted protestors and other individuals. Afterward, on their Twitter account, RAM celebrated how at the Berkeley riots "we were the first guys to jump over the barrier and engage [which] had a huge impact."

As the rally broke up, rally attendees and protestors dispersed onto the streets of downtown Berkeley. Daley, Miselis, and Gillen, alongside other RAM associates and rally attendees such as co-defendant Cole White, followed a large group of protestors who were leaving the area. In several instances, RAM members chased and attacked protestors, punching and kicking them. For example, the following photograph depict Gillen punching and stomping a counter-protestor, or – as he described it – "tuning up a commie:"



Earlier in the day, Miselis had broken his hand by punching someone in the back of the head, and later casually stood by and watched Gillen and other RAM members in this encounter. According to Miselis' text message describing this instance, he "was about to jump into that but our guys were just wrecking them" and that there was "not even any room to get a hit in." Meanwhile, as depicted in the next three photographs, Daley pursued other counter-protestors down the street, one of whom he ran up to and kicked from behind:



 

Following the rally, photographs depicting defendant and other RAM members assaulting protestors and other persons were covered on the news and on various Neo-Nazi, white supremacist websites. Again, RAM members celebrated this coverage, and used the Internet to post photographs and videos of assaults committed by RAM members in order to recruit members to engage in violent confrontations at future events. In a text message on April 16, 2017, Miselis described the event as "a total Aryan victory." On May 15, 2017, the RAM Instagram account posted a photograph of a RAM member wearing a black skull mask at the Berkeley event along with the comment, "#rightwingdeathsquad." On January 10, 2018, the RAM Twitter account posted a message describing itself as "the only alt right crew that actually beats antifa senseless and wins rallies." On February 14, 2018, the RAM Gab account posted a photograph of a RAM member punching a protestor at the Berkeley event along with the text, "Talk shit get hit!"

Because Miselis had broken his hand by punching someone in the back of the head at Berkeley, future RAM trainings events would include training on using "palm strikes" and elbows to avoid repeat injuries. Over the summer of 2017, all three defendants attended these trainings to prepare for future rallies.

## C.    The Rise Above Movement's Summer of 2017

After Berkeley in April 2017 and before Charlottesville in August 2017, the Rise Above Movement continued to train and recruit members in the summer of 2017. One of their bread-

and-butter events was to conduct book burnings on the beach in Southern California. At least one of these occurred on or about July 3, 2017, on which date Daley texted Miselis "You gonna go to the book burning?" to which Miselis replied, "Yeah, you?" In the government's investigation, the government obtained a number of photographs through open sources and from the defendants' digital devices of these book burnings. Prominently featured in many of these photographs from the book burnings are books such as *The Diary of Anne Frank*, *The Jewish Book of Why*, *Schindler's List*, and *Trapped in Hitler Hell*, as well as Daley and Gillen performing Roman ("Nazi") salutes and the "white power" hand sign.






In this last photograph, the RAM members have placed what appears to be a pork chop on

*Schindler's List* and *Diary of Anne Frank.*

A few days after the July 3, 2017 bookburning, all three defendants decided to attend a workshop on "White Privilege" that was sponsored by the Committee for Racial Justice.   On July 8, 2017, Miselis sent a text message to Daley with an online URL link to the workshop, describing it as:

> The free workshop will include short videos and group discussion will be used to inform and to explore specific ways to combat the racism that pervades our culture. Resource persons include representatives from Raising Racially Conscious Children and Dr. Bob Gordh & professor Michele Dumont, active members of White People for Black Lives & AWARE (Alliance of White Anti-Racists Everywhere).[2]

Daley replied, "let's go."   The event was planned for the evening of July 9, 2017, and Daley, Miselis, and Gillen (depicted from left to right) attended wearing masks and sought to disrupt the workshop with their "Da Goyim Know" sign and anti-Semitic rhetoric.



Later that night, Miselis wrote a fellow RAM member, wanting to claim victory for disrupting the workshop: ("would be solid if the goys could claim the thing in Santa Monica tonight").   "We crashed a (((white privilege)))[3] seminar in Santa Monica and triggered the fuck out of all these

---

2 *See* http://www.smdp.com/white-privilege-and-what-we-can-do-about-it/161612

3  The triple parentheses, also known as an "echo," are used by neo-Nazis and white supremacists to highlight the names of individuals or organizations thought to be owned or controlled by Jewish people.   It is believed to either have originated from, or popularized by, a former white

Jews and blacks there." When asked who attended, Miselis replied: "It was just Ben, Tom, and me."

### D. Preparations and Travel to Charlottesville in August 2017

In or around the spring and summer of 2017, an event referred to as the "Unite the Right" rally was organized and scheduled to occur on August 12, 2017, at Emancipation Park in Charlottesville, Virginia. This rally was widely promoted on social media and internet sites associated with white-supremacist individuals and groups, and was scheduled to feature a lineup of well-known white-supremacist speakers.

In late July, all three defendants obtained plane tickets to fly from Los Angeles, California, to Charlottesville. Revealed for the first time at his motion to reconsider pretrial detention, Daley knew that he would commit acts of violence in Charlottesville, and so he did his best to avoid a paper trail for his travel arrangements. Accordingly, he asked a family member to purchase the ticket for him, claiming that he was merely going to visit a female friend, even though he had more than sufficient funds in his bank accounts (and even offered to pay Cole White for his ticket) and a debit card (which he used to rent the 15-passenger van that RAM took to Berkeley). When Miselis arrived in Charlottesville on August 11, 2017, Daley advised Miselis the same: "Make sure to not use your card. Hit the ATM and use cash."

After fighting together in Berkeley on April 15, 2017, Daley and Cole White maintained contact, often through phone calls. In one call in the summer of 2017, Daley asked White if he was going to attend the Unite the Right rally in Charlottesville. Daley offered to pay for the White's flight and his stay in Charlottesville, and encouraged him to attend the event. Daley told him: "It's going to be like Berkeley again . . . It's going to be the event of the year."

All three defendants – Daley, Miselis, and Gillen – flew from Los Angeles, California to

---

supremacist blog in which the parentheses symbolized the echoing of Jews' actions throughout history. In this context, Miselis is claiming that the term "white privilege" is of Jewish origin.

Charlottesville, Virginia, arriving on August 11, 2017. The defendants were excited about this trip to Charlottesville, and they *knew* it would become a riot. For example:

- Miselis knew that their prior experience in Huntington Beach and Berkeley would be an asset. On June 30, 2017, the day after he bought his ticket, the defendant posted on the Discord platform to the "Charlottesville" thread for Unite the Right Rally participants: "Looking forward to the day. Will be bringing another Berkeley / Huntington vet."

- On July 24, 2017, Daley posted on the Discord platform to the "Charlottesville" thread for Unite the Right Rally participants that he and his co-defendants were "experienced at these events" and that "all were in Berkeley riots."

- On August 9, 2017, Daley texted Miselis to tell him that Cole White would be staying with them in Charlottesville, describing him as an "Excellent fighter" and that he was "[s]toked to have him with us."

As the day of the Unite the Right rally grew near, the location of the rally was uncertain. The City of Charlottesville sought to relocate the rally to the McIntyre Park, outside of the downtown area. On the Discord thread, rally organizers and participants were venting frustrations about the uncertainty with the pending preliminary injunction hearing to take place in the Western District of Virginia. Daley responded to the thread: "Regardless, we should all still go. I'm flying out from CA with a handful regardless. Fuck these Jews."

Prior to leaving California, Miselis agreed to purchase torches and helmets for himself, his co-defendants, and others once he arrived in Charlottesville. He texted Daley for a precise count on the number of helmets needed, asking "Hey I remember u said get 10 torches, let me know how many helmets again before you leave." To conceal any paper trail, Miselis used his debit card to make a nominal purchase for a 98-cent pack of gum with $100.00 in cash back, which he then used to purchase baseball helmets for himself and fellow RAM members. Daley purchased athletic tape at the Wal-Mart to wrap their fists in order to prevent their hands from breaking when they punched someone, and a tactical knife.

### E. The Torch-Lit March at the University of Virginia on August 11, 2017

On August 11, 2017, the evening prior to the scheduled Unite the Right rally, hundreds of individuals, including Daley, Miselis, Gillen, and White, were gathering to engage in a torch-lit march on the grounds of the University of Virginia in Charlottesville, Virginia. At a nearby field where the group was gathering, the defendants lined up in formation, lit their torches, and waited for the march to commence. In the following photograph, Daley, Gillen, and White are preparing to march near the front of the line:



Miselis was deeper in the procession, chronicling their participation and others by his Go-Pro camera, which he attached to his chest harness.

Throughout the march, the participants (including the defendants) engaged in chants promoting or expressing white supremacist and other racist and anti-Semitic views, such as "Blood and soil!" and "Jews will not replace us!" and "Anti-White!" The march culminated near the University of Virginia's Rotunda, where a smaller group of individuals, including University of Virginia students, had gathered around a statue of Thomas Jefferson to protest the torch-lit march. Members of this group held a banner that read: "VA Students Act Against White Supremacy," depicted below:



Chanting and bearing torches, the march participants encircled the Thomas Jefferson statue and surrounded the protestors.   Violence erupted among the crowd, with some individuals punching, kicking, spraying chemical irritants, swinging torches, and otherwise assaulting others.   White, Gillen, and Daley were captured in the below photograph near the time that the violence broke out.



During and in furtherance of this riot, RAM members and associates – in particular Daley and White – punched and struck multiple individuals with a torch.   After the students and protestors left, Miselis's own Go-Pro video captured him yelling "total victory" and "we beat you tonight, we'll beat you tomorrow too!"

After the torch march, Daley told White that he needed to stop punching people in the head because he was going to injure his hand.   On February 6, 2018, in a conversation on Facebook, Daley admitted to an associate that he was present at "the fight at the torch march" and that he "hit like 5 people."   Some individuals, including anticipated Unite the Right speaker Christopher Cantwell, sprayed chemical irritants into the crowd.   Daley told his associate that pepper spray was unnecessary because "We had the[m] completely surrounded."   In memorializing his post-Charlottesville "observations" in a Word document found on his Apple laptop computer, Daley thought the torchlit march of August 11th was a resounding triumph.   He wrote: "All in all Friday was a HUGE success . . . I was proud and honored to be there as a part of it."

**F.  The Unite the Right Rally on August 12, 2017**

On the morning of August 12, 2017, multiple groups and individuals espousing white-supremacist and other anti-Semitic and racist views, including the Rise Above Movement and the defendants, arrived in and around the vicinity of Emancipation Park in Charlottesville, Virginia, to attend the Unite the Right rally.   When they showed up to Emancipation Park, Daley, Miselis, and Gillen had in fact wrapped their hands with the white athletic tape purchased the day prior. Miselis carried their baseball helmets in his backpack.   After several instances of violence prior to the scheduled start of the rally, law enforcement declared an "unlawful assembly" and required rally participants to disperse.

One of the first breakouts of violence on the morning of August 12 involved all four defendants.   It occurred on 2nd Street NE, between Jefferson and High Streets, in downtown Charlottesville.   Daley, Miselis, Gillen and White were part of a large group of (over forty) individuals seeking entry to Emancipation Park by way of 2nd Street NE, but were told by members of law enforcement they had to enter from a different location.   The group, including the defendants turned around, lined up, and began to make their way through a group of (over twenty) individuals who had come to the rally to protest against racial and other forms of

discrimination. This racially diverse crowd of counter-protestors included several members of a Unitarian Universalist church.

As they made their way through the group of protestors, the defendants collectively pushed, punched, kicked, choked, head-butted, and otherwise assaulted several individuals, resulting in a riot.

The defendants – consistent with the membership in RAM and their conspiracy – committed multiple acts of violence, including but not limited to, the following. First, Daley punched an African-American protestor at least twice and kicked him once, as depicted below;



Miselis helped to push the African-American to the ground, where he also struck a female counter-protestor on the ground, as depicted below:



Daley punched a second male protestor, who Miselis later kicked as he was falling to the ground, as depicted in these three photographs.






Miselis kicked this victim so hard that he broke his own toe.

Next, Daley, together with Cole White, grabbed and assaulted a female counter-protestor and threw her into the street, depicted in these two paragraphs.



Finally, Daley grabbed a female counter-protestor by the throat, choking her, and then threw her to the ground.





As each of the defendants has admitted as part of their guilty pleas, none of these acts of violence were in self-defense.

In the moments after the attack, a camera followed the defendants as they walk to Emancipation Park.   Daley looked to the camera and said: "This country's ours. Times up."   He made a throat-slashing gesture and added: "All of you."



Once they got into the park, the defendants got together and – according to Cole White – celebrated what they had just done as "awesome."   Daley again reiterated that he needed to stop punching people in the head out of fear of injuring his own hands.   Had this case proceeded to trial, Cole White would have testified that "Anyone who wasn't on our side was going to get it,"

and that the defendants' violence on 2nd street was unjustified.

Later in the day, the defendants stayed in and around Emancipation Park prior to the start of the rally, where many additional violent interactions occurred between protestors and rally attendees. Miselis and Daley spent a lot of time at the intersection of 2nd and Market Streets. Miselis, as memorialized by video footage, sought to provoke protestors to "come and get it" or to "come get some."



Daley also sought to provoke counter-protestors, standing on a sign and making his throat-slashing gesture again.




Later, in a subsequent burst of violence, Miselis – who was holding a "The Goyim Know" sign –punched a protestor at the top of the stairs that led into Emancipation Park, punched the protestor again, and then pushed the protestor down the stairs.





This assault was captured on video, which Miselis shared with Daley on August 20, 2017. Daley replied to the defendant "You should have ran in [and] chest kicked that faggot down the stairs." Miselis replied: "Yeah, massive regret after watching that footage . . . next time he's going flying." This conversation makes clear that, even in the days and weeks that followed August 12, 2017, the defendants' primary regret about their time in Charlottesville was not having exacted *enough* violence.

### G. The Aftermath of August 11-12, 2017

After August 12, 2017, the co-founder of RAM – Robert Rundo (who did not attend) – asked Daley and Miselis to take down any photographs of RAM at Charlottesville because he

thought it would hurt RAM's image. Daley and Miselis disagreed, but removed the photographs reluctantly. The defendants followed the news closely in Charlottesville's aftermath, and they believed that "Jews [were] trying to make trump do another statement about this weekend an[d] official[ly] condemn us."

Photographs soon surfaced on the internet from the 2nd Street riot that the defendants started. These photographs included Daley choking a female protestor and Miselis kicking the protestor as he was falling to the ground. *See supra*, Section I.F. On August 16, 2017, in discussing the photographs, Daley and Miselis had the following conversation over text message:

Daley: My bad bruh is that when you hurt y[ou]r toe?

Miselis: Yeah I think so, didn't even see my foot on the left side of that pic at first. And lol @ u choking a bitch in the 2nd one. Where'd you find these? Hopefully no one else comes cross em.

Daley: Some lame little article
Fuck these hoes white shariah now
24/7 thot[4] patrol.

On August 22, 2017, a bartender was working at a restaurant in Southern California when he noticed two males at the bar, one of whom – later identified as Ben Daley – said that "We just got back from Charlottesville." With the events of August 11th and 12th recently in the news, that bartender, L.T., started to pay attention to the conversation. It became clear to L.T. that Daley was seeking to recruit the other individual at the bar to an organization. In the conversation, Daley stated, among other things:

- That "him and another guy started the group called RAM, and so, and that they train in Orange County and Carson."

- "[T]heir whole reason to be [in Charlottesville] was to wreak havoc. And, you know, to kick ass."

- That his hand was still "sore and swollen" and that he could "barely close it."

- Daley bragged about "When you see a bunch of guys like us dressed the way we

---

[4] "Thot" is a derogatory term frequently used by white supremacists to refer to a woman. It is an acronym for "that hoe over there."

are coming in, it's scary.   Can you imagine seeing that?"

- That "it was important for us to win California.   We've got to win here, because . . . my parent's generation let, let it go to[o] far here or there's too many immigrants."

(*Testimony of L.T.* at 10-12, 16).   L.T. was able to take a photograph of the two individuals, Daley depicted on the right:



Ben Daley's financial records confirmed a purchase at the restaurant where L.T. worked on August 22, 2017.   During the conversation, Daley took out his phone and showed the potential recruit photographs, stating words to the effect of "This is a picture of me hitting [somebody] . . . I don't need this to get out."   *Id.* at 22.   Daley stated that "this is what we do."   To L.T., the potential recruit seemed impressed.   *Id.*

The most concerning piece of information that L.T. heard, however, occurred towards the end of the conversation.   L.T. heard Daley state: "We're going after feminists now."   (*Id.* at 11-12).   This was of particular concern to the L.T., who had a family member who identified as a feminist, and he decided to report the conversation to law enforcement immediately thereafter.

## III. THE PLEA AGREEMENT AND STATUTORY PENALTIES

On October 2, 2018, following an extensive federal investigation, all three defendants were arrested on a criminal complaint issued by United States Magistrate Joel C. Hoppe from the Western District of Virginia. On October 10, 2018, a federal grand jury indicted the defendants on two counts: Count One charged the defendants with a conspiracy to violate 18 U.S.C. § 2101, all in violation of 18 U.S.C. § 371, and Count Two charged the defendants with a substantive violation of § 2101 for their travel and acts of violence in furtherance of a riot in Charlottesville. In April and May 2019, all three defendants pled to Count One in exchange for dismissal of Count Two. The maximum penalty for Count One is five years' imprisonment, a $250,000 fine, up to three years of Supervised Release, and a $100 Special Assessment. The plea agreements are similar in many respects, but have some material differences:

- As to Defendant Daley, he agreed to an enhancement as an organizer/leader of the organization, unlike Gillen and Miselis. Daley's plea also is pursuant to Rule 11(c)(1)(C), with an agreed-upon range of 27 to 42 months' imprisonment.

- As to Defendant Gillen, as more completely stated in the plea agreement, his completion of prosecution provision includes additional language that he not be prosecuted for violation of 18 U.S.C. § 922(g) for the firearm possession that was discovered as a part of the investigation in this case.

Otherwise, the plea agreements are the same. They all contained a "completion of prosecution" provision that they will not be further prosecuted by the United States for the conduct included in the Statement of Offense; they all stipulate to the application of the Aggravated Assault Guideline under § 2A2.2, and enhancements for more than minimal planning, and bodily injury; and all of the plea agreements allow the defendants to appeal on the grounds that 18 U.S.C. § 2101 is unconstitutional.

## IV. DETERMINING THE SENTENCES TO BE IMPOSED.

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the United States Sentencing Guidelines are no longer mandatory. However, "[a]s a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and

the initial benchmark" for determining the defendant's sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). While, to be sure, "[i]n accord with 18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence," *Kimbrough v. United States*, 552 U.S. 85, 90 (2007), it remains the case that "the Commission fills an important institutional role: It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.'" *Id.* at 108-09 (*quoting United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)). The Supreme Court "accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Id.* at 109 (*quoting Rita v. United States*, 551 U.S. 338, 350 (2007)). As the Fourth Circuit has recognized, in the wake of *Booker*, a sentencing judge is required to engage in two-step analysis to determine a reasonable sentencing:

> [A] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence.

*United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).

When weighing the section 3553(a) factors as part of its determination of an appropriate sentence, the Court should consider not only the nature and circumstances of the offense and the history and characteristics of the defendant, but also the applicable sentencing objectives — that is, that the sentence: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment; (4) afford adequate deterrence; (5) protect the public; and (6) effectively provide the defendant with needed educational or vocational training and medical care. *See* 18 U.S.C. § 3553(a)(1) and (2). In addition, the sentence should reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

# V.     GUIDELINES ANALYSIS

The defendants' total offense levels were correctly calculated to be 21 (for Daley) and 19 (for Miselis and Gillen).   As explained below, the United States Probation Office correctly applied the three-point enhancement for a hate crime motivation under § 3A1.1(a) and this Court should do the same.

## A.   Guidelines Calculation

In determining the total offense level, the United States Probation Office referenced the guidelines stipulated by the plea agreement:

| | | |
|---|---|---|
| USSG § 2A2.2 | Aggravated Assault | 14 |
| USSG § 2A2.2(b)(1) | More than minimal planning | +2 |
| USSG § 2A2.2(b)(3)(A) | Victims sustained bodily injury | +3 |

For Daley only, he received an additional two-point enhancement for his aggravating role as an organizer/leader.   Finally, the U.S. Probation Office applied the three-point enhancement for a hate crime motivation pursuant to § 3A1.1(a).   With Criminal History Categories of I, II, and IV respectively for Miselis, Daley, and Gillen respectively, the following guideline ranges resulted:

- For Defendant Miselis, at total offense level of 19 and criminal history category I, a guideline range of 30 to 37 months' imprisonment.

- For Defendant Gillen, at total offense level of 19 and a criminal history category of IV, the guideline range of 46 to 57 months' imprisonment.

- For Defendant Daley, at total offense level of 21 and a criminal history category of II, a guideline imprisonment range of 41 to 51 months.

Should the Court adopt the terms of his plea agreement, Daley also has an 11(c)(1)(C) range of 27 to 42 months' imprisonment.

## B. The U.S. Probation Office correctly applied an enhancement for a "Hate Crime Motivation" pursuant to USSG § 3A1.1(a), and this Court should do the same.

All three defendants should receive the three-point enhancement for having a "hate crime" motivation pursuant to USSG § 3A1.1(a).   That guideline provides:

(a) If the finder of fact at trial, or in the case of a plea of guilty or nolo contendere,

the court at sentencing determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because the actual or perceived race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of any person, increase by three levels.

United States Sentencing Commission, *Guidelines Manual,* § 3A1.1(a) (Nov. 2018). The Commentary provides additional guidance in its Background section:

Subsection (a) reflects the directive to the Commission . . . to provide an enhancement of not less than three levels for an offense when the finder of fact at trial determines beyond a reasonable doubt that the defendant had a hate crime motivation. To avoid unwarranted sentencing disparity based on the method of conviction, the Commission has broadened the application of this enhancement to include offense that, in the case of a plea of guilty or nolo contendere, the court at sentencing determines are hate crimes.

USSG § 3A1.1, comment. (backg'd.). The text of the Guideline and its background make clear that the Court makes the final determination of whether the defendants' crime was a hate crime.[5]

The evidence makes clear that the defendants' crimes were bias-motivated within the meaning of the hate crime enhancement, and the Court has multiple, independent bases upon which to apply it here. First and foremost, the evidence proves that the defendants' crimes were motivated by their misguided perception that their enemies and their victims – specifically counter-protestors at the California and Charlottesville rallies – were Jewish. Second, the defendants' crimes – which involved acts of violence against at least two female victims – were motivated by gender and their targeted hatred of women and feminists. Third, and no less significant, the

---

[5] The defendants may argue that § 3A1.1(a) *only* applies only where the offense of conviction is statutorily defined as a "hate crime," where a defendant's bias motivation is an element of the offense, such as "Hate Crime Acts" in violation of 18 U.S.C. § 249. To be sure, the hate crime enhancement would apply in such cases, *see, e.g., United States v. Fields*, 3:18CR00011, W.D. Va. (Urbanski, J.) but there is nothing in the text of the guideline indicating such a limited application. In fact, Section 3A1.1's background commentary cited above – that a Court should make an evidentiary determination as to whether a particular crime is a hate crime – makes clear that it is not limited to those offenses of which bias-motivation is an element of the offense. This outcome makes logical sense, as it would defy common sense for the hate crime motivation enhancement to apply only to those offenses in which it were already taken into account. *See also In Re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d (2d Cir. 2008) (court of appeals upholding district court's application of hate crime enhancement in a violation of 18 U.S.C. § 2332(b)); *United States v. Horsting*, 204 Fed. App'x 441 (5th Cir. 2006) (hate crime enhancement under § 3A1.1(a) applied to assault with a deadly weapon in a violation of 18 U.S.C. § 113(a)).

defendants' acts of violence were also motivated by the fact that their victims were allied with groups they despised, to include Jewish people, African Americans, women, and others they perceived as non-white. Each of these provide a basis upon which the Court can, and should, apply the enhancement.[6]

### 1. The defendants' crimes were motivated by their hatred of Jewish people and their misguided perception that their victims were Jewish.

As an initial matter, the defendants' arguments in their objections ignore that the hate crime enhancement includes motivations based upon the "actual *or perceived* race, color, religion, national origin . . ." USSG § 3A1.1(a) (emphasis added). It does not matter whether the defendants' victims were *actually* Jewish, just what the defendants' perceived in their own minds. And the evidence overwhelmingly shows that the defendants' crimes were motivated by their hatred of Jewish people and their misguided perception that their victims (and anyone who does not agree with their own extremist ideology) are Jewish.

The case of *United States v. Houghtaling*, 390 Fed. Appx. 604 (7th Cir. 2010) is instructive, where the hate crime enhancement was applied based upon a defendant's inaccurate perception that someone was Jewish. While serving a prison sentence, the defendant sent a letter to a federal district judge threatening to kill her. *Id.* at 605. Houghtaling was the leader of a white supremacist organization, and in the letter he claimed that he wanted to kill the judge in part

---

6 To apply the enhancement, the Court must find that the offense would not have occurred but-for the bias motivation – meaning, that their played the determinative role in the defendants' to commit the acts of violence against the victims. *See Burrage v. United States*, --- U.S. ---, 134 S. Ct. 881, 888 (2014) (defining but-for causation as a cause that is "the straw that broke the camel's back," regardless of whether other contributing factors are present). The hate crime enhancement does *not* require that the bias was the sole, primary, or even secondary reason for the assault. Accordingly, just because the counter-protestors were blocking the defendants' path on 2nd street does little to defeat the application of the hate crime enhancement. *See id.* ("[I]f poison is administered to a man debilitated by multiple diseases, it is a but-for cause of his death even if those diseases play a part in his demise, so long as, without the incremental effect of the poison, he would have lived."); *see United States v. Miller*, 767 F.3d 585 (6th Cir. 2014) (holding that, under § 249(a)(2)(A), causation is satisfied when the person's actual or perceived religion was the reason the defendant decided to act—that is, the straw that broke the camel's back") (citations and quotation marks omitted); *United States v. Metcalf*, Case No. 15-CR-1032-LRR, 2016 WL 1599485 (N.D. Iowa Apr. 20, 2016) (applying this standard to prosecution under 18 U.S.C. § 249(a)(1)).

because of her husband, whom he believed to be Jewish. *Id.* at 605. At the defendant's sentencing for violation 18 U.S.C. § 876(c), which is not a hate crime statute, the federal district court applied the Hate Crime motivation enhancement under § 3A1.1 "based on his (erroneous, as it happens) belief that [the victim's] husband was Jewish." *Id.* at 606. Although the application of the enhancement was not at issue on appeal, the Seventh Circuit nevertheless noted that a sentence at the statutory maximum was particularly appropriate in light of the "vile racist and anti-Semitic hatred." *Id.* at 608.

Here, the context shows that the defendants were members of a white supremacist organization that regularly espoused anti-Semitic ideologies and converted that anti-Semitic ideology into violent action. As part of their activities, in addition to training to prepare for violence, all three defendants joined together for book-burnings where they burned *The Diary of Anne Frank* and *Schindler's List* while photographing themselves performing Nazi salutes and "white power" signs. These three defendants sought to disrupt events in Santa Monica geared towards racial awareness, spouting their anti-Semitic rhetoric among people who were genuinely seeking to raise awareness of racial issues in their communities. Daley also espoused violence against Jews, claiming in a text message on February 19, 2017 that Jewish people "belong in ovens . . . most foul people."

But, it is not just generalized anti-Semitism that serves as the strongest evidence of their motivations for their crimes. Such evidence provides a helpful backdrop in evaluating the more particularized evidence in which the defendants specifically linked their bias-motivation to the offense to which they have pleaded guilty, for example:

Huntington Beach on March 25, 2017

- On March 25, 2017, when Daley texted a female associate that he was planning to go to a rally at Huntington Beach (the first riot included in Count One) – where RAM members would later assault protestors – he added "fuck these Jews."

- Prior to that Daley painted a sign that RAM would use again at Huntington Beach and Berkeley that stated "Da Goyim Know," a reference to their supposed

knowledge of the "truth" about a Jewish conspiracy to control world affairs and eliminate the white race.

Berkeley Riots of April 15, 2017

- At the Berkeley riots of April 15, 2017 (the second riot in Count One), Daley posing wearing his skull mask while holding a bagel in one hand, a reference to Jewish culture, and a white power sign with the other.

- Multiple photographs of RAM members flashing "white power" signs with their hands in their travel to, and during, the Berkeley Riots.

Charlottesville on August 11-12, 2017

- In the lead-up to the Unite the Right rally, Daley's declaration that everyone should still attend Unite the Right rally regardless of the location, and professing: "Fuck These Jews."

- All three defendants' participation in the August 11, 2017 torch-lit march in which the participants chanted "Jews will not replace us" and culminated in violence by at least Daley and White, all of which Daley described as a "Huge success."

- In a photograph found on Miselis's phone, the Star of David had been transposed over top of one victim's head – more specifically – the victim Daley punched and Miselis kicked so hard he injured his foot.



- In video footage captured on Miselis's Go-Pro, on August 12, 2017, Miselis and Daley are standing at the intersection of 2nd and Market Streets throwing water bottles and yelling at the crowd of counter-protestors: "Fuck these Jews!"

- Miselis punching a counter-protestor while holding a sign that reads "The Goyim Know."

- In memorializing his post-Charlottesville "observations" in a Word document found on his Apple laptop computer, Daley wrote "we were not prepared for the police and ZOG[7] to (((shut down))) our event." The use of ZOG and the "echoes" both demonstrate his belief that Jews were to blame for the shutdown of the Unite the Right rally of August 12, 2017.

Upon review of this evidence, there is no question that the defendants' crimes had a bias-motivation with the meaning of the enhancement. The defendants' viewed their victims (and all counter-protestors) to be Jews that were part of Jewish-led conspiracy to marginalize the white race, and the defendants targeted these victims because of that motivation. Accordingly, these defendants easily meet the threshold for the enhancement. *See e.g.*, *United States v. Horsting*, 204 Fed. Appx. 441, 445 (5th Cir. 2006) (applying enhancement to a prison assault because defendant was "likely involved with a gang called Dirty White Boys, and the attackers were shouting racial slurs during the assault.")

Moreover, even members of Daley's family recognize the defendants' violence as hate crimes. In October 2017, when many of the photographs from the riot on 2nd Street in Charlottesville became public in an article published by *ProPublica,* a family member texted Daley that: "This is violence not self defense" and that "Your message is racist and violent." Daley replied that he and his co-defendants were merely defending themselves because they were attacked, the family member replied: "You've never been harmed by any Jew or Black. Protest meth dealers and I could understand." Daley replied that: "I actually have . . . You wanta take a wild guess of the ethnicity of the owners of the company selling OxyContin?? They're Jewish."

---

7 ZOG is a term used by white supremacists and neo-Nazis that stands for "Zionist Occupied Government," and refers to a supposed Jewish organization that controls world affairs.

## 2.  Moreover, the defendants targeted their victims because of gender.

Putting aside the defendants' belief that their enemies (and victims) were Jewish, the evidence provides yet an additional basis upon which this Court should apply the hate crime enhancement.   The evidence showed that the defendants targeted and assaulted female victims because of their gender.

As the photographs made clear, the two victims who received the worst of the defendants' violence on August 12, 2017, were female.   The first was the female whom Daley choked and threw into the street, shown in the photographs below:

 

Within a week, Daley and Miselis laughed about this in text messages.   As Miselis wrote to Daley, "lol @ u choking a bitch."   Daley replied: "Fuck these hoes white shariah now" and "24/7 thot patrol."   Their celebration of violence and Daley's reply of "thot patrol" makes clear that the defendants were "patrolling" or targeting women for violence.

If that were not enough, the defendants also celebrated their violence against the other female victim whom Cole White head-butted and Daley assaulted during the 2nd Street riot.   This victim sustained multiple facial injuries from the defendants' assault, and blood was visibly streaming down her face after her being attacked.   Significantly, however, they made their intent for this attack clear when they bragged about it afterward, as evidence by the following image

found on Daley's phone, depicting this female victim, with the words "THOT STATUS: PATROLLED:"



Again, this photograph provides yet further evidence that the defendants were "patrolling" or targeting female victims.

Finally, within two weeks of Charlottesville, Daley bragged to a prospective RAM recruit in a bar in California bragging that they were targeting feminists. As the bartender testified, he heard Daley explicitly state: "We're going after feminists now." (*Testimony of L.T.* at 11-12). This conversation is corroborated by the text messages by Daley on October 17, 2017 to his family member in which he claimed that the women he and his co-defendants assaulted on 2nd street were "a pack of insane feminists and blacks attacking us."

This evidence makes clear that the defendants selected their targets for violence during the riot on the basis of their gender by assaulting (and, in their words, "patrolling") women, and it provides the Court with yet another basis under which the hate crime enhancement in § 3A1.1 should apply.

### 3. The defendants' crimes were motivated by their belief their victims were allied with racial and ethnic groups they despised.

Although this Court has more than sufficient bases upon which the hate crime enhancement should apply with respect to the defendants' perception of their victims as Jews and their intentional targeting of females, there is yet another basis upon which the hate crime enhancement should apply. Finally, and no less significant, the defendants' acts of violence were also motivated by the fact that their victims were allied with groups they despised, to include Jewish people, African-Americans, and other people they perceived to be non-white.

Apparently overlooked by the defendants in their objections to the PSRs, the application of the hate crime enhancement is not tied to a victim's actual or perceived membership in a protected class. Rather, its text makes clear that it applies to circumstances where the motivation can be based upon the membership in a protected class "of any person." This "any person" language is consistent with congressional intent concerning the punishment of hate crimes. *See, e.g.,* 18 U.S.C. § 249 (the Shepard-Byrd Act of 2009, which criminalizes causing bodily injury to any person "because of the actual or perceived race, color, religion, or national origin of *any* person"). This broad language is intentional, and it provides for the logical application of the hate crime enhancement regardless of the victim's membership in a protected class. For example, if a defendant killed someone because that person allowed their children to play with African-American children, such conduct would clearly be a bias-motivated crime regardless of the victim's membership in any protected class.

The same would apply to the case before the Court. The counter-protestors that were present in Charlottesville – including those on 2nd Street that morning whom the defendants attacked – were protesting the exact types of racial and other forms of discrimination that the defendants and the Rise Above Movement espouse. Even if the evidence did not show that the defendants viewed their enemies as Jewish, at a bare minimum, the defendants viewed the counter-protestors (and their victims) as race-traitors and "Jew-lovers" allied with those groups that they

hated, to include but not limited to: Jewish people, African Americans, immigrants, and other racial and ethnic minorities. *See Houghtaling*, 390 Fed. Appx. at 605 (applying hate crime enhancement where defendant considered federal judge victim as a "race traitor and a Jude lover whore who prostitutes herself to niggers, spics, and Jude's."). The defendants' attack against counter-protestors that day was motivated *both* by their hatred of Jews, African-Americans, and immigrants *and* of the Caucasian people who ally with those groups whom, to the defendants, are race traitors. Accordingly, this provides yet another basis upon which this Court should apply the hate crime enhancement.

### C. The Hate Crime Enhancement Should Apply to All Defendants.

The government recognizes that, with respect to bias-motivation, the evidence is strongest for Daley and Miselis. However, the hate crime enhancement should apply to all three defendants because the bias-motivated assaults in furtherance of a riot were clearly "jointly undertaken criminal activity" by all three defendants, and these acts of violence were (i) within the scope of that jointly undertaken criminal activity; (ii) in furtherance of that criminal activity; and (iii) reasonably foreseeable in connection with that criminal activity. USSG § 1B1.3(a)(1)(B). The whole point of RAM was to attend these rallies as a group and to work in concert and engage in acts of violence such as those committed in Berkeley and Charlottesville, and Gillen's active and repeated participation in RAM is plenty sufficient to warrant the enhancement.

Moreover, there should be no question that Gillen shared the ideological outlook and bias-motivation of his co-defendants. From Gillen's digital devices, the FBI recovered photographs of Gillen dressed as a member of the Ku Klux Klan, Gillen holding firearm and the "Da Goyim Know" sign; and Gillen and Daley posing with a sign derogatory to immigrants and refugees stating "Rapeugees Not Welcome!" These three photographs are depicted below.





Finally, as outlined above, Gillen attended the aforementioned book-burnings and the disruption at the workshop to raise racial awareness in Santa Monica. This evidence makes clear that the bias-motivation was hardly limited to Daley and Miselis, and the enhancement applies just as much to Gillen.

### VI. The Factors in 18 U.S.C. § 3553(a) Require the Requested Sentences.

At the defendants' respective sentencing hearings, the government will address each of the section 3553(a) factors as to why the requested sentences for each defendant appropriately account for the nature and circumstances of the offense, the history and characteristics of the defendant,

and the need for the sentence to reflect the seriousness of the offense; promote respect for the law; provide just punishment; afford adequate deterrence; protect the public; and effectively provide the defendant with needed educational or vocational training and medical care.  *See* 18 U.S.C. § 3553(a)(1) and (2).

### VII. CONCLUSION

For the reasons cited above, and for those to be cited at the defendants' sentencing hearings, the Court should apply the Hate-Crime enhancement pursuant to § 3A1.1(a).   In any event, the following terms of imprisonment are necessary, sufficient, and not greater than necessary to properly account for each of the factors outlined in Section 3553(a) factors, and the Court should impose these terms of incarceration as to each defendant:

- As to Defendant **Benjamin Daley**, a term of 42 months' imprisonment followed by a term of three years' supervised release.

- As to Defendant **Michael Miselis**, a term of 30 months' imprisonment, followed by a term of three years' supervised release.

- As to Defendant **Thomas Gillen**, a term of 46 months' imprisonment, followed by a term of three years' supervised release.

WHEREFORE, the United States submits this memorandum in aid of sentencing and in support of its request for the imposition of the significant periods of incarceration outlined above.

Respectfully submitted,

   /s/Thomas Cullen
THOMAS T. CULLEN
UNITED STATES ATTORNEY
WESTERN DISTRICT OF VIRGINIA

   /s/Christopher R. Kavanaugh
Christopher Kavanaugh, Va. Bar. 73093
Assistant United States Attorney
United States Attorney's Office
255 W. Main Street
Charlottesville, VA 22902
434-293-4283
christopher.kavanaugh@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 15, 2019, I electronically filed the foregoing motion with the

Clerk of the Court using CM/ECF system, which will send notification of such filing to all

counsel of record.

        /s/Christopher R. Kavanaugh
Christopher Kavanaugh, Va. Bar. 73093
Assistant United States Attorney
United States Attorney's Office
255 W. Main Street
Charlottesville, VA 22902
434-293-4283
christopher.kavanaugh@usdoj.gov