```
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF VIRGINIA
 2                       Charlottesville Division

 3   UNITED STATES OF AMERICA,           Criminal No. 3:18cr00025

 4                Plaintiff,

 5          vs.                          Charlottesville, Virginia

 6   MICHAEL PAUL MISELIS,
                                         2:56 p.m.
 7                Defendant.             July 19, 2019

 8

                     TRANSCRIPT OF SENTENCING HEARING
 9              BEFORE THE HONORABLE NORMAN K. MOON
                 UNITED STATES SENIOR DISTRICT JUDGE
10

     APPEARANCES:
11

     For the United States:        THOMAS T. CULLEN
12                                 U.S. Attorney's Office
                                   310 First St. SW, Ste. 906
13                                 Roanoke VA 24008

14                                 CHRISTOPHER R. KAVANAUGH
                                   U.S. Attorney's Office
15                                 255 W. Main St. Room 130
                                   Charlottesville VA 22902
16
     For the Defendant:            WARREN E. COX
17                                 CoxFedLaw, LLC
                                   422 1st St.
18                                 Shenandoah VA 22849

19   Court Reporter:               Sonia Ferris, RPR, OCR
                                   U.S. Court Reporter
20                                 116 N. Main St.  Room 314
                                   Harrisonburg, VA 22802
21                                 540.434.3181.  Ext. 7

22

23

24
     Proceedings recorded by mechanical stenography; transcript
25   produced by computer.
```

```
 1              THE COURT:  Mr. Miselis, I have your presentence

 2   report.  You'll have a right to speak in your own behalf, but

 3   first, have you and your attorney had an opportunity to

 4   review the report, including any revisions that might have

 5   been made?

 6              THE DEFENDANT:  Yes, Your Honor.

 7              THE COURT:  Are there any issues in dispute in this

 8   case -- other than I would rule the same way in his case with

 9   regard to the enhancement.

10              MR. COX:  No, Your Honor; just the enhancement.

11              THE COURT:  In this case, I would rule the same way,

12   that the evidence does not prove beyond a reasonable doubt

13   that he singled out any particular victim because of the

14   particular victim's actual or perceived race, color,

15   religion, national origin, ethnicity, gender identity,

16   disability or sexual orientation.  And I will, for the

17   record, just put in his, along with his sentencing, the

18   statement similar to that I made with regard to Mr. Daley.  I

19   won't repeat it here.

20              Do you wish to be heard?

21              MR. CULLEN:  Your Honor, without the enhancement, the

22   government's understanding is he's an total offense level 16

23   and an advisory range of 21 to 27 months.  Assuming my

24   calculation is correct, the government would respectfully ask

25   for a sentence somewhere within that advisory guideline range
```

1  for the following reasons:  First, with respect to the nature

2  and circumstances of the offense as to this defendant, he,

3  like Mr. Daley, although this defendant was not a founder or

4  a leader of this organization, was a member, beginning in

5  Huntington Beach, including Berkeley, and then infamously

6  made the trip to Charlottesville in August of 2017.  Once in

7  Charlottesville, he committed particularly violent acts.

8  We've seen evidence -- photographs, videos and the like --

9  that depict him punching and kicking an African-American man

10 on the ground after Mr. Daley had started to throw that man

11 on the ground.  He kicked another bystander victim on Second

12 Street, in the stomach, so hard that he broke his toe in the

13 process.  Later that day, after he made his way to

14 Emancipation Park, he threw water bottles at other protesters

15 while yelling "F these Jews," and he punched a man multiple

16 times on the top of the steps near Emancipation Park while

17 holding an anti-Semitic sign.  So although he wasn't a leader

18 or organizer like Mr. Daley, he was certainly an enthusiastic

19 and violent member of this organization.  Again,

20 Charlottesville wasn't the only time this defendant had

21 engaged in this conduct.  He did it on at least two other

22 prior occasions.

23       Your Honor, this defendant's history and

24 characteristics do not warrant a variance below the advisory

25 guideline range.  In our view, they support a sentence within

1    that range.  The fact that he has no prior criminal record is

2    not an adequate basis to vary downward.  The guideline range

3    that I just recited takes his lack of criminal history into

4    account.  Because he doesn't have a prior record, he's got a

5    lower advisory guideline range.  The fact that he lost his

6    job with a defense contractor because of his affiliation with

7    a white supremacist group and committing violent acts in

8    California and Charlottesville also does not warrant a

9    variance below the advisory guideline range.  All criminal

10    defendants, to some extent, face some economic hardship as a

11    result of being brought to justice as a result of their

12    criminal conduct.

13         It is certainly true this defendant comes from a

14    loving family.  They gave him many advantages and he is

15    highly educated; but that is not, in the government's view, a

16    proper basis to vary below the advisory guideline range.

17         Even though he was, until somehow he got off track in

18    life, a successful, obviously brilliant student, and on his

19    way to becoming a productive member of society at a very high

20    level, it's equally true for the better part of two years, he

21    was a member of a militant white supremacist group that

22    committed pretty despicable acts of violence in

23    Charlottesville and elsewhere.  He wasn't tricked.  He wasn't

24    misled.  He joined this organization voluntarily, and he

25    eagerly and enthusiastically participated in committing

 1   violent acts.

 2          I would also point out -- I made the argument with

 3   respect to kind of an increasing level of dangerousness.

 4   This is the history and characteristics argument.  Daley,

 5   after he returned home is still recruiting.  This defendant,

 6   like Mr. Daley, was participating in target practice with

 7   assault rifles, shooting out of a moving van.

 8          I would remind the Court, we put on evidence at this

 9   defendant's bond hearing that at the time he was arrested on

10   or about October 1, 2018, in his residence in California, he

11   had over a thousand rounds of ammunition and a book entitled

12   How to Bomb the U.S. Government.  This defendant was becoming

13   increasing more militant as time went on and, unfortunately,

14   that's who this defendant was when he was arrested, and

15   that's the defendant you have in front of you today, in spite

16   of all the good things he had done in his life, the fact that

17   he had a loving family, and the fact he was a bright and

18   successful student.

19          For the same reasons I articulated in the prior

20   sentence, a guideline sentence will provide just punishment.

21   It will afford adequate deterrence to this defendant, who has

22   demonstrated a propensity to engage in violent conduct as

23   well as others who may be motivated to do the same and it

24   will protect against unwarranted sentencing disparities among

25   co-defendants.

1          Thank you.

2          MR. COX:  Your Honor, before argument, I would like

3    to call a witness if I could.

4          THE COURT:  All right.

5          MR. COX:  Judy Miselis.

6      ALICE JUDITH MISELIS, CALLED AS A WITNESS BY THE DEFENSE,

7                           SWORN

8                     DIRECT EXAMINATION

9    BY MR. COX:

10   Q.   Ma'am, would you please state your name for the record?

11   A.   Alice Judith Miselis.

12   Q.   Where do you live?

13   A.   Stockton, California.

14   Q.   What is your occupation?

15   A.   I am a registered nurse.

16   Q.   Do you know Mr. Michael Miselis?

17   A.   I gave birth to him.

18   Q.   Could you describe for us his childhood?

19   A.   Michael's always been a very, very quiet child.  He's

20   been very studious.  He's never one to ask for help.  He's

21   always been trying to find -- solving the problem himself.

22   He's always been caring.  He's always been loving.

23   Q.   Could you tell us what sort of student he was?

24   A.   He was a very good student.  He graduated top of his

25   high school class, 4.6, 4.5 GPA.  He was picked as a pinnacle

Alice Judith Miselis - - Direct                    7

1    student, and was accepted into multiple universities.  He

2    chose UCLA.  He started off as a computer engineering student

3    and midway through, changed to aerospace engineering.  Even

4    though he changed his majors, he managed to graduate in that

5    four-year time period.

6         He's always a person, child, kid, who was always

7    concerned about the financial aspects of things in that he

8    knew that he needed to not waste our money in taking time in

9    school.  He's always been one -- just kind of amazed me

10   sometimes.  He'd go to the thrift stores and come home with

11   the worst clothing in the world that were old men clothing,

12   and he'd cut the pants off to make shorts out of them just to

13   save money.  He's been very conservative in that aspect and

14   very conservative with spending our money in that he didn't

15   need anything, didn't need any help and would manage on his

16   own.

17   Q.   Could you describe his social relationships?

18   A.   He's always been more studious than social.  He's had

19   his core group of friends in high school -- Jimmy Sanchez,

20   Navdeep Singh, Michael No. Two.  So he had a small group of

21   friends that were similar to him in that they were very quiet

22   people, very studious people.

23        At 14, I asked him what he wanted for his birthday and

24   he wouldn't tell me.  I quizzed him more and he still

25   wouldn't tell me because it cost too much.  So I still

Alice Judith Miselis - - Direct                    8

```
 1  insisted he tell me and it was to build a computer from
 2  scratch.
 3  Q.   Who did he build that computer with?
 4  A.   He built it -- well, I helped because I learned a lot,
 5  and then Navdeep helped the most because Navdeep -- when you
 6  buy a computer, it has all the parts in it and all the
 7  software.  When you make a computer, there's a clear
 8  motherboard where you have to install Microsoft and that sort
 9  of thing and get things up and running.  So he's -- yeah.
10  He's been very conservative.  Cost a lot less to buy one,
11  though, than to make.
12  Q.   What were his goals?
13  A.   I think just to be successful.  I've always known he
14  wanted to be some type of engineer from the time he was
15  little.  He was always building things with Legos.  He was
16  going to follow in grandpa's footsteps, that sort of thing.
17  Just to be successful.
18  Q.   How did these charges affect your family?
19  A.   It's the most devastating thing in the world.  The only
20  worst thing that could ever happen is if some -- if he wasn't
21  here.  This has been worse for my husband, myself, our
22  children, relatives.  It's worse than the death of our
23  parents.  It's absolutely the worst thing that's ever
24  happened.  I think -- I know it's the worst thing that's ever
25  happened to him.  He's done nothing but apologized to us in
```

Alice Judith Miselis - - Direct                    9

1    every phone call and wrote letters apologizing for all of

2    this that has occurred.  I know he can rebuild.

3    Q.   I wanted to ask you about that.  After he's released

4    from confinement, what sort of help are you going to provide

5    for him?

6    A.   We will be there for him.  We will be there to get our

7    Michael back.  What he is portrayed as here is not the real

8    Michael.  I know he's made mistakes.  He's certainly picked

9    the wrong friends.  I think because he's never been a very

10   social person where he's been with other studious people that

11   he was easily led into this group of buddies or this group of

12   friends, that would say, Let's go work out, and Let's go do

13   this kind of stuff -- because this is not his personality at

14   all.  He's always been very gentle.  He's been very loving.

15   He has two nieces and a nephew, his sister's children,

16   Salvador, Josephine and Ada.  When Salvador was probably

17   about two-and-a-half, for some reason, he started calling him

18   Uncle Oley.  Even when our dog -- we, unfortunately, had to

19   put her down because she was so sick.  Michael called and I

20   put the phone up to the dog's ear and he talked to her for a

21   while and she just perked right up.

22   Q.   Do you think he'll be able to recover from this?

23   A.   Absolutely.  We are there to support him in any way we

24   can.  We're there to strengthen him, to get our Mikey back.

25   Q.   Is there anything else you want to tell the judge?

Alice Judith Miselis - - Direct                    10

1   A.   Yeah, I would.

2        Your Honor, on Tuesday afternoon was the first time I've

3   seen our son in almost a year.  It was through glass.  I have

4   not been able to touch him, to just give him a hug.  So I ask

5   please, after -- and I don't care who's there or what I have

6   to do -- can I just hug my son?  I don't know when I'll be

7   able to see him again.

8        Please, if you see it within your will to have mercy on

9   him, he's really, really a very, very good person.  He's

10  always been very hardworking.  He's always been very loving

11  and kind.  Everybody that knows him has been totally, totally

12  shocked in this whole situation.  It's never been him to be

13  aggressive, to be mean.  It's just out of character for him.

14  I think -- my apologies, and thank you for any consideration

15  towards him.  I appreciate that.

16        MR. COX:  Thank you.

17        THE WITNESS:  Sorry.  I got too emotional.

18        MR. CULLEN:  No questions.

19        MR. COX:  Your Honor, this case is a lot about public

20  shame or disgrace.  Mr. Miselis brought that upon himself

21  through his own actions.  We're not excusing that.  We're not

22  trying to minimize that.  He brought it upon his family.  As

23  you can see from his mother, the devastating impact this had

24  upon his family because it was shocking.  It was completely

25  at odds with everything they knew about him his entire life

1   until this happened.  It brought shame to his friends and

2   colleagues.  As you heard, he has friends of different ethnic

3   backgrounds, and as you can imagine, as an engineer at the

4   top levels -- I mean, when we say someone is smart, we call

5   them a rocket engineer.  That's what he was.  And he's

6   working with people of all different ethnic backgrounds, and

7   all of that is in danger of being lost now because of this.

8   You know, again, he realizes this.  He pled guilty to this.

9        Then he brought shame on this community.  We've all

10  lived through this.  We know what happened.  We saw today

11  those things that occurred here on August 11th and 12th, and

12  he's deeply ashamed for that.  But, Your Honor, he wasn't

13  born in April or March of 2017.  He had 28 years before then,

14  and I submit that this is one of the most accomplished

15  defendants that has ever come before you.  I mean, it's

16  incredible what he's done with his life up until he started

17  this chain of events that led us here today.

18       As his mother said, he did well in school, very well.

19  He's one of the top student in his high school.  He went to

20  UCLA, majored in aerospace engineering and completed a

21  four-and-a-half engineering program in four years.  Entered

22  the graduate program in aerospace engineering and got his

23  Masters degree.  And then, he went on to his Ph.D.  Again, he

24  had other ethnic colleagues he was working with in the

25  graduate program, including his advisers.  He was leading a

1    rocket propulsion program.  Honestly, when I went through his

2    resume, I needed a dictionary to read through it.  All the

3    things he's done in his life are at such a high level.  At

4    the time that he was pursuing his Ph.D., he also was employed

5    at Northrop Grumman, one of our top defense contractors, and

6    he was actually doing national defense work.  He was a

7    modeling simulation analyst, and he was involved with making

8    computer simulations of air to air and air to ground combat.

9    These things are crucial to our national security.  He had to

10   have a Top Secret clearance, and anybody that has ever had

11   one of those knows they don't just pass those out like candy.

12   He had to go through a rigorous, detailed character

13   investigation, which he passed and for which he was granted

14   the clearance.  So up until March of 2017, he had a blameless

15   life and one that if any of our children was able to achieve

16   what he achieved, we'd be very proud.

17          Now, everything about his history bespeaks to mercy.

18   But what happened here, the circumstances?  We saw, again, in

19   excruciating detail what happened in Berkeley, in

20   Charlottesville.  Now, I'll say this, and this was brought

21   out today.  He didn't even know the co-defendants until March

22   of 2017 at Huntington Beach.  That's where he met them.  He

23   had an interest in politics.  And actually before then, he

24   had never really been involved with politics at all.  But he

25   met up with these guys in Huntington Beach and he fell in

with them.  He had never had friends like this before.  If you've ever been around engineers, they're of a certain type. I realize it's a stereotype, but it's kind of justified. They are people who are very studious and maybe kind of boring.  Those are the kind of friends he always had.  Then he met these guys and they were so different from all the other friends he had.  He had never really been part of this really cool group of guys.  They all had their little code names.  He was Chuck.  We had, like -- what -- Rick Flair and Ben Torrance.  Again, I'm not saying that they were just like a club and they were just out to do things, you know, that some goofy club might do.  They were doing things that are very, you know -- very serious offenses.  But it's important to realize, you know, that he was just a follower.  He wasn't one of the leaders.  He wasn't one of the co-founders of this organization.

Again, we're not trying to say he didn't commit violence that day in Charlottesville.  He did.  But the government pointed out or tried to make the argument that since Charlottesville, he continued to be a danger to society because they found some ammunition when they did a search of his apartment.  There was no -- nothing illegal about that. It was completely legal for him to have ammunition, and the same with this videotape of them, you know, engaging in target practice and shooting from a car.  Again, it's not

1    something he should have been doing, but there was nothing

2    illegal about it.

3            I would like to point out that the two instances

4    where he was involved in violence at Berkeley and in

5    Charlottesville, there were no weapons used at all.  In fact,

6    they had no weapons with them.  We all saw the videotape of

7    people heavily armed -- more armed than the police.

8    Mr. Miselis was not armed.  He actually didn't even have a

9    baseball bat or anything at all that could be considered a

10   weapon.  In fact, he wasn't even wearing the baseball helmet,

11   which he kept in his backpack.  So the fact that he also

12   happened to own guns and happened to own ammunition has no

13   relationship to the instant offense.

14           After Charlottesville, he has not been accused of any

15   other violent acts.  That got his attention, and he certainly

16   did not either escalate what he had done in Charlottesville

17   or continue to be a danger.

18           Now, as far as the need for the sentence, the message

19   to send out to society -- and I'll try to be very brief here.

20   Let's look at deterrence here.  Mr. Miselis has lost far more

21   than any other co-defendant in this case --

22           THE COURT:  Well, that is one of the least impressive

23   things to me.  He had the greatest opportunity.  We get it

24   all the time -- these poor people, drug addicts; we ought to

25   whip up on them.  They didn't start out with anything.  Most

1   of them, you could have predicted where they were going to be

2   when they were two years old.  But the fact -- bank

3   presidents who embezzle, come in and say, People don't trust

4   me anymore and I can't get a job as a bank president.  Well,

5   that's good you're not getting a job.

6        MR. COX:  Your Honor, I wasn't trying to elicit

7   sympathy.

8        THE COURT:  I'm just saying it's not fair to the poor

9   and ignorant to treat them -- beat up on them and say, Oh,

10  you're brilliant and you could have been great if you hadn't

11  done this, and treat you good because of what you could have

12  done.

13        MR. COX:  I understand, Your Honor.  I was just

14  trying to make an argument about deterrence to the public as

15  a whole.  I wasn't arguing for extra sympathy because of what

16  he lost.  I was just trying to make the point that the public

17  looking at this case, whether or not it's fair or unfair for

18  them to have extra sympathy for people that had high

19  attainments, I think they would see that as something that he

20  did lose and would be factored into their opinion as to

21  whether or not, you know, extra criminal -- I'm sorry --

22  extra prison sentence would be needed to show the public that

23  this was a serious offense.  I'm just trying to point out

24  that there was a great downfall in this case because of his

25  own actions but that extra time is not needed to make the

1    point to the public that, you know, he committed a serious

2    offense and should be punished for it.  I think that is

3    important.

4          Also, as far as deterrence is concerned, his criminal

5    category, you know, he has not committed any offenses

6    whatsoever, and statistics show he has a very, very low

7    chance of recidivism in this case.  So, you know, just

8    looking at statistics, there's very little chance that he's

9    going to go out there and commit another offense.

10          I'll just briefly mention he's not in need of any

11   sort of you know, educational or vocational training or drug

12   or alcohol treatment so there's no necessity to consider that

13   when considering his sentence.

14          Finally, Your Honor, I'd like to address the

15   unwarranted sentence disparities issue.  My co-counsel in

16   another case spoke about Cole White, and it's unknown at this

17   time what his ultimate sentence would be, but, again, the

18   government did agree to bond after seven months.  We'd submit

19   that Cole White is a far more violent individual than

20   Mr. Miselis.  His specialty was head-butting.  There's no

21   doubt that he committed many violent acts.  You know, so when

22   you compare these two -- and also, you know, again, with

23   Mr. Miselis's criminal offense category, we believe that's

24   something that the Court should consider.

25          Also, the fact that my client pled guilty, he did

1    spare the government money.  He also pled guilty as soon as

2    we had received all the discovery.  So, you know, we think

3    that that's something that should be considered.

4         Mr. Miselis did commit this offense.  It's something

5    that he's caused shame to himself and to his family for, but

6    he does deserve a second chance.  He's worth more than the

7    offense that he committed.  You know, he has had great things

8    given to him and he did have great opportunity.  But he

9    should be allowed to contribute to society, to be allowed to

10   return --

11        THE COURT:  He's not facing a life sentence.

12        MR. COX:  Your Honor, I just wanted to point out as

13   far as completing his Ph.D. program, that those credits do

14   become stale after a while.  It's not known at this time

15   whether or not he's going to be able to return to that.

16   Again, he had this great opportunity and his own acts

17   interfered with that.  But I just wanted to point out the

18   sooner that he can return to that program, the more likely it

19   will be that he'll be allowed to both enter and complete the

20   program.  We just think the time is an issue there with being

21   able to complete that program and, again, to contribute to

22   society.

23        For all those reasons, we believe that 12 months and

24   a day would be sufficient or the minimum necessary to meet

25   all the goals of sentencing in this case.  If the Court finds

```
1    that that is not sufficient, we would also ask for that

2    sentence combined with home confinement.

3            Thank you, Your Honor.

4            THE COURT:  Anything else?

5            MR. CULLEN:  No, Your Honor.

6            THE COURT:  Here again, the Court has to consider the

7    factors in 3553(a), and the history and characteristics of

8    the defendant, and of course, here, we have a real mixed

9    history here.  Someone who's doing, apparently, everything

10   right, took a wrong turn.  The Court has to consider the

11   seriousness of the offense, which I deem it to be a very

12   serious offense.

13           In this case, I can't get away from the fact how much

14   he seemed to be the most violent of these people in these

15   films.  It seemed to me, what I saw, he was into it up to his

16   elbows, just flailing away.  So, I think the sentence I'm

17   going to impose will take that into account and promote

18   respect for the law and prevent recidivism by him for as long

19   as he's incarcerated, and should serve as deterrence to other

20   persons similar to him who might be inclined to do the same

21   as he.

22           Would you stand, Mr. Miselis?

23           Is there anything you would like to say before the

24   Court pronounces sentence?

25           THE DEFENDANT:  Yes, Your Honor.
```

1          I have absolutely made mistakes and I accept

2    responsibility for them.  I learned from this experience.  I

3    don't intend to let these mistakes define my life.  I'm very

4    sorry and I understand I've let a lot of people down.  I've

5    worked hard in the past and I'm eager to begin working

6    towards the future, and I intend to be a productive member of

7    society again.

8          THE COURT:  Having consulted the advisory sentencing

9    guidelines and the factors noted in 18 U.S.C. 3553(a), it is

10   the judgment of the Court that the defendant is committed to

11   the custody of the Bureau of Prisons to be imprisoned for a

12   total term of 27 months.  The sentence is within the advisory

13   guideline range that is less than 24 months, and the specific

14   sentence is imposed after consideration of the factors set

15   forth in 18 U.S.C. 3553(a).

16          Upon releases from imprisonment, defendant shall be

17   on supervised release for a term of two years.  You must

18   comply with the following mandatory conditions of

19   supervision:  Not commit another federal, state or local

20   crime; not unlawfully possess a controlled substance; refrain

21   from any unlawful use of a controlled substance.

22          You must submit to one drug test within 15 days of

23   release from imprisonment and at least two periodic drug

24   tests, as determined by the court.

25          You must cooperate in the collection of DNA, as

1    directed by the probation officer.

2         You must comply with the standard conditions of

3    supervision adopted by this Court as well as the following

4    special conditions:  Pay any special assessment, fine and/or

5    restitution imposed by the judgment; provide the probation

6    officer with access to any requested financial information;

7    not incur new credit charges or open additional lines of

8    credit without the approval of the probation officer; reside

9    in a residence free of firearms, ammunition, destructive

10   devices or dangerous weapons.

11        You must participate in a program of testing and

12   treatment for substance abuse, as approved by the probation

13   officer, until such time as you have satisfied all

14   requirements of the program.

15        You must submit to warrantless search and seizure of

16   person and property, as directed by the probation officer, to

17   determine whether you're in possession of firearms and

18   illegal controlled substances.

19        You must submit to warrantless search and seizure of

20   person and property, as directed by the probation officer or

21   other law enforcement officer, whenever such officer has

22   reasonable suspicion that you are engaged in criminal acts.

23        It is ordered that you pay the United States a

24   special assessment of $100, due and payable immediately.

25        Pursuant to the plea agreement in this case, Count 2

```
1    is hereby dismissed as it pertains to you.

2          Other than the constitutionality of the statute of

3    conviction, you have waived your right to appeal your

4    sentencing and that waiver is binding unless the sentence

5    exceeds the statutory maximum or is based on a

6    constitutionally impermissible factor.  If you undertake to

7    appeal despite your waiver, you may lose the benefits of your

8    plea agreement.

9          If a right of appeal does exist, a person unable to

10   pay the cost of an appeal may apply for leave to appeal

11   without prepayment of such costs.

12         Any notice of appeal must be filed within 14 days of

13   entry of judgment or within 14 days of a notice of appeal by

14   the government.

15         If requested, the clerk will prepare and file a

16   notice of appeal on behalf of the defendant.

17         Anything else?

18         MR. COX:  Yes, Your Honor.

19         Again, I would -- for the record, we wanted to get

20   our objection in for the constitutionality of 18 U.S.C. 21.

21         THE COURT:  Noted.

22         MR. COX:  Also, Your Honor, we'd ask that the Court

23   recommend he be confined at the Dublin facility, which is

24   close to his home in Stockton, California.

25         THE COURT:  All right, sir.
```

```
 1          Anything else?

 2          MR. CULLEN:  I believe this defendant, like

 3  Mr. Daley, had filed a motion for bond.  The government would

 4  oppose that for the reasons at the prior hearing.

 5          MR. COX:  Yes, Your Honor; that's right.

 6          THE COURT:  I do not find it's clear and convincing

 7  that he does not pose a danger and will deny the motion.

 8          We'll take a few minutes until you bring up the next

 9  one.

10          (Proceedings concluded at 3:31 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**<u>INDEX</u>**

**<u>WITNESS FOR DEFENSE</u>**                    <u>Direct</u>

Alice Judith Miselis              6

"I certify that the foregoing is a correct transcript from

the record of proceedings in the above-entitled matter.


<u>/s/Sonia Ferris</u>                    <u>August 13, 2019</u>"