USA v. Miselis 3:18cr25 Dentention Hrg. 12/3/2018

1              UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF VIRGINIA
2                CHARLOTTESVILLE DIVISION

3  ****************************************************************

4  UNITED STATES OF AMERICA,     CRIMINAL CASE NO.:  3:18CR25
                                 December 3, 2018   11:28 a.m.
5                                Charlottesville, Virginia
                                 Detention Hearing
6          Plaintiff,
   vs.
7
   MICHAEL PAUL MISELIS,         Before:
8                                HONORABLE NORMAN K. MOON
                                 UNITED STATES DISTRICT JUDGE
9          Defendant.            WESTERN DISTRICT OF VIRGINIA

10 ****************************************************************

11 APPEARANCES:

12 For the Government:     THOMAS T. CULLEN, U.S. ATTORNEY
                          United States Attorneys Office -
13                        Roanoke
                          Western District of Virginia
14                        310 First Street, SW, Suite 906
                          Roanoke, VA 24011
15                        540-857-2901
                          Thomas.Cullen@usdoj.gov
16
                          CHRISTOPHER ROBERT KAVANAUGH, AUSA
17                        United States Attorneys Office -
                          Charlottesville
18                        Western District of Virginia
                          255 West Main Street, Room 130
19                        Charlottesville, VA 22902
                          434-293-3981
20                        christopher.kavanaugh@usdoj.gov

21

22
   Court Reporter:  JoRita B. Meyer, RPR, RMR, CRR, FOCR
23                  210 Franklin Road, S.W., Room 540
                    Roanoke, Virginia  24011
24                  540.857.5100, Ext. 5311
            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25 TRANSCRIPT PRODUCED BY COMPUTER.

USA v. Miselis 3:18cr25 Dentention Hrg. 12/3/2018

```
 1   APPEARANCES CONTINUED:

 2
     For the Defendant:        WARREN EUGENE COX, ESQUIRE
 3                             CoxFedLaw, LLC
                               422 1st Street
 4                             Shenandoah, VA 22849
                               540-742-5385
 5                             genecox@coxfedlaw.com

 6

 7

 8                      INDEX OF EXHIBITS

 9   EXHIBITS ON BEHALF OF THE GOVERNMENT:

10        EXHIBIT:                Marked      Received

11        1                       3           3

12

13   EXHIBITS ON BEHALF OF THE DEFENDANT:

14        EXHIBIT:                Marked      Received

15        (NONE)

16   ////

17

18

19

20

21

22

23

24

25
```

USA v. Miselis 3:18cr25 Dentention Hrg. 12/3/2018

1   (Proceedings commenced, 11:28 a.m.)

2          THE COURT:  Call the case, please.

3          THE CLERK:  This is the case of the *United States of*

4   *America versus Michael Paul Miselis*, Case Number 3:18-CR-25,

5   defendant number 2.

6          THE COURT:  All right.  Government ready?

7          MR. CULLEN:  We are, Your Honor.

8          THE COURT:  Defendant ready?

9          MR. COX:  Yes, Your Honor.

10          THE COURT:  All right.  This is a de novo hearing,

11   so the government is asking for retention, I gather.

12          MR. CULLEN:  Thank you, Your Honor.  Good morning.

13   May it please the Court.  Thomas Cullen for the United

14   States.

15          For purposes of this bond appeal, and with the

16   Court's permission, I intend to proceed by proffer and

17   argument.

18          THE COURT:  All right.

19          MR. CULLEN:  In so doing, I've got some exhibits for

20   the Court.  I have copies for Mr. Cox as well.

21          (Government's Exhibit 1 received)

22          MR. CULLEN:  As the Court is aware, we're seeking

23   reversal of the California magistrate judge's decision, after

24   she initially determined that Mr. Miselis was a danger to the

25   community, that he should be released on a secured bond.

USA v. Miselis 3:18cr25 Dentention Hrg. 12/3/2018

1          Respectfully, Your Honor, we believe that decision,

2   which in fairness to the magistrate judge, was based on very

3   limited information about the case, the defendant's personal

4   involvement with a militant white supremacist group, the

5   strength of the evidence, and extensive international ties

6   and travel on behalf of the defendant, we believe that her

7   decision -- that releasing him on secured bond would satisfy

8   concerns about his dangerousness and risk of flight -- was

9   misguided.

10         In our view, Your Honor, there are simply no

11  conditions or combination of conditions that would reasonably

12  assure the safety of the community and the defendant's

13  reappearance in future court proceedings.

14         I think as a threshold matter, from a legal

15  standpoint, Judge, it's important to note that we're seeking

16  a detention hearing under two prongs of the Bail Reform Act.

17         First, Section 3142(f)(1)(A).  In our view, based on

18  strict application of the statute, the riot statute, we

19  believe it qualifies as a crime of violence under the Bail

20  Reform Act's definition of such in that it requires as an

21  element acts of violence, attempted violence, and threat of

22  violence, and because it involves a substantial risk that

23  physical force will be used in the commission of the offense.

24         But we're also seeking a detention hearing under

25  3142(f)(2) because there is a serious risk that this

USA v. Miselis 3:18cr25 Dentention Hrg. 12/3/2018

1    defendant will flee prosecution if he's released.

2            And I would note to the Court that the magistrate

3    judge in California didn't consider that factor.  And again

4    in fairness to her, she had limited information about this

5    defendant's extensive travel overseas to meet with white

6    supremacist groups and other things.

7            Either way, no matter which prong we proceed under,

8    Judge, the Court needs to consider, or should consider,

9    respectfully, both his potential dangerousness and risk of

10   flight.  3142 makes that clear.

11           So let's look at the 3142 factors, the detention

12   factors, that the Court should consider today.

13           First, the nature and circumstances of this offense.

14   The defendant is alleged to have committed particularly

15   violent acts in Charlottesville and elsewhere.  The Court has

16   in front of it several photographs that are still frames from

17   videos.  And what those photographs depict -- and I'll go

18   through each one in just a minute, but in summary, they

19   depict the defendant punching, kicking, stomping, and pushing

20   numerous people along 2nd Street Northeast as part of the

21   August 12, 2017 Unite the Right Rally.

22           If the Court will take note, Exhibit Number 2, the

23   second photograph, depicts a man who has fallen to the

24   ground, he's bent over, and on the left side of that

25   photograph you see someone's leg.  He's got Adidas athletic

USA v. Miselis 3:18cr25 Dentention Hrg. 12/3/2018

1   pants with three stripes.  He's got his hands taped.  And

2   he's holding in his left hand -- or his right hand the Rise

3   Above Movement banner that's depicted in other photographs.

4          Your Honor, if you flip back to the first page, the

5   first exhibit, you'll see the defendant holding that same

6   banner in his hand.

7          Turn to the second page and you'll see that it's the

8   same hand, same banner.

9          And the other exhibits clearly depict the defendant

10  is wearing those Adidas pants.

11         So we believe -- and I'll explain in just a

12  minute -- that the defendant kicked that young man so hard in

13  that second photograph that the defendant broke his toe when

14  he did it.  He was complaining he thought he had broken his

15  foot because he'd used so much force kicking this man as he

16  fell to the ground on 2nd Street.

17         But, Your Honor, the defendant, with respect to the

18  nature and circumstances of the offense, committed similar

19  acts of violence in other political rallies in California

20  months before he came to Charlottesville.

21         The second thing the Court should consider with

22  respect to the bond determination is the strength of the

23  evidence.

24         Your Honor, the evidence in this case against the

25  defendant is overwhelming.  There are numerous videos and

1    photographs, taken by a variety of witnesses, bystanders on

2    2nd Street, and multiple news organizations, depicting the

3    defendant committing these violent and riotous acts in

4    Charlottesville.

5          Your Honor, the defendant himself was wearing a body

6    camera during the Unite the Right Rally.  Both on August

7    11th, when he participated in the tiki torch rally on the

8    grounds of the University of Virginia, and the following day,

9    when he committed those violent acts, he was wearing what's

10   called a GoPro camera so he could memorialize himself

11   committing various violent acts.  And that's evidence the

12   government has and is going to introduce in his trial.

13         In addition, Your Honor, we have numerous eye

14   witnesses, victims, and rally participants who will testify

15   that the defendant himself committed these violent acts.  So

16   you have the video, the photographs, and you have percipient

17   eye witnesses who were standing on that street who were

18   either struck by this defendant or witnessed him do that, and

19   will testify about that.

20         Your Honor, after the Unite the Right Rally, when

21   this defendant went home to California, he authored numerous

22   text messages bragging about committing acts of violence in

23   Charlottesville.  And I'm going to read you one of the text

24   messages that the defendant wrote when Exhibit Number 2

25   appeared on various social media sites and these participants

USA v. Miselis 3:18cr25 Dentention Hrg. 12/3/2018

1  found out that these pictures were now on the internet.  Let

2  me quote to you.

3          So the context for this text message is one of the

4  defendant's co-conspirators sent him this photograph, Number

5  2, and he asked him:  "Is that you in the picture kicking

6  this guy?"

7          And this is what the defendant said in response.

8  Quote, "Yeah, I think so.  Didn't even see my foot on the

9  left side of that picture at first, and laughed out loud at

10 you choking a" -- B-I-T-C-H; he uses the word -- "in the

11 second one.  Where did you find these?  Hopefully, no one

12 else comes across them."

13         Well, we've come across them, Judge.  We have all of

14 defendant's text messages where he brags about committing

15 various acts of violence in Charlottesville.

16         Moreover, Your Honor, the defendant himself admitted

17 on at least two occasions to customs and border patrol

18 officers, when he reentered the United States after traveling

19 internationally to Europe, that he had attended the

20 Charlottesville rally and that he had also attended political

21 rallies where riots ensued in Huntington Beach and Berkeley,

22 California.

23         Your Honor, we have travel records.  We have the

24 defendant's phone records.  We have his bank records.  We

25 have miscellaneous receipts showing and corroborating that

USA v. Miselis 3:18cr25 Dentention Hrg. 12/3/2018

1    the defendant himself was in Charlottesville, and it

2    corroborates the already overwhelming evidence as set forth

3    in the videos, the photographs, and the eye witness

4    testimony.

5         Let me briefly raise this point.  There is no valid

6    self-defense claim in this case.  The defendant deployed to

7    multiple political rallies in order to engage in riotous

8    conduct and commit acts of violence.

9         Simply put, Your Honor, you can't avail yourself of

10   self-defense when you travel to engage in a street fight.

11   And that's what this defendant did, and he did it on more

12   than one occasion.

13        History and characteristics of this defendant.  The

14   government will concede that the defendant is highly

15   educated.  He's a smart guy.  He did well in high school.  He

16   attended, I believe, the University of California, Los

17   Angeles, UCLA.  I believe he was in the sixth or seventh year

18   of a Ph.D. program in aerospace engineering.  He held a top

19   secret security clearance.  He had everything going for him.

20        But it's equally true that this defendant was a

21   member of a militant white supremacist group that committed

22   acts of violence in support of its antisemitic and racist

23   ideology.  They did it in Charlottesville, and they did it in

24   multiple rallies in California.  And the defendant was all-in

25   with respect to membership in this group.

USA v. Miselis 3:18cr25 Dentention Hrg. 12/3/2018

1        I'd like to read for the Court the FBI 302.  When

2   this defendant was arrested on October 2nd in California, the

3   FBI prepared an inventory, the items that they found in his

4   residence.  And I'll just cite several of these items for the

5   Court: journal with possible IED instructions; hobby fuse

6   cord and matches; black skull mask; flares; wire pull smoke

7   device; bandannas; a book entitled *How to Bomb the U.S.*

8   *Government*; white power foreign language stickers; docs

9   containing foreign travel contacts and declarations; an

10  e-ticket for Warsaw, Poland; white supremacist propaganda,

11  travel documents and receipts; two cases of AR-15 ammunition;

12  and three ammo cans.

13       And it's my understanding there were thousands of

14  rounds of AR15-type ammunition in the defendant's residence.

15       Aerosol, possible mace; a metal 88 sign.  And the

16  Court probably doesn't know this, but 88 is the number for

17  Adolf Hitler.  He had that banner sign in his residence.  And

18  a black billy club.

19       So these were some of the items that this defendant

20  had on his person, in his residence, over a year after he

21  came to Charlottesville to participate in the Unite the Right

22  Rally.

23       Your Honor, the defendant over the last nine months

24  has made at least two trips to the Ukraine, where we suspect

25  he met with representatives of a group called the Azov

USA v. Miselis 3:18cr25 Dentention Hrg. 12/3/2018

1   Battalion, which is a right wing white supremacist

2   paramilitary organization that we believe may have ties to

3   the Russian government.

4            This defendant also has a Ukrainian girlfriend that

5   he is still in touch with.  I think that right there

6   demonstrates that he has substantial ties internationally to

7   some very problematic groups, and he has a significant tie to

8   a young lady that he feels very strongly about who is located

9   overseas.

10            Last spring, in addition, Judge, he traveled to

11   Germany with several RAM members to attend the Sword and

12   Shield Festival, which has been described as the biggest

13   white nationalist rally of the year.  It's a festival where

14   white nationalists and white supremacists in Europe and the

15   United States gather to celebrate Adolf Hitler's birthday.

16            From there he went to Italy, where he met with

17   members of a neofascist political party.

18            Your Honor, this defendant has already attempted to

19   obstruct justice.  During one border inspection meeting when

20   he came back to the United States in Los Angeles, when he

21   flew in, he was stopped by border patrol officers, and during

22   that interview he did a factory reset on his phone in order

23   to wipe the data that was on his phone.  He knew they were

24   interested in his involvement in riots in California and

25   Charlottesville.  Because they were asking those questions

1    during the course of that interview, he attempted to wipe the

2    data off his phone.

3            I would also note for the Court that one of

4    Mr. Miselis's codefendants or coconspirators in a second but

5    related case in California, one of the leaders of the Rise

6    Above Movement, named Robert Rundo, after the defendant and

7    the three other defendants were charged in Charlottesville,

8    were arrested, Mr. Rundo attempted on two occasions to travel

9    internationally to flee prosecution.  Because he knew that

10   the authorities in California were very likely to try to

11   charge him, Mr. Rundo fled to El Salvador, and the FBI was

12   able, thankfully, to arrest him there, and he's been

13   extradited to the United States.  So this organization, in

14   addition to having substantial ties overseas, one of its

15   members and leaders has already attempted to flee to a

16   foreign country.

17           Couple more points, Judge.  First, since the

18   defendant has been arrested, associates of and sympathizers

19   of this particular group, the Rise Above Movement, have made

20   threats against government agents and officers and one news

21   organization as a result of their arrests in this case.

22   That's something that's being investigated by the FBI and

23   other law enforcement agencies, but it shows you the ties

24   that this particular group has in social media and the

25   lengths that they will go to in order to further their cause.

USA v. Miselis 3:18cr25 Dentention Hrg. 12/3/2018

1           In short, Your Honor, given all of this -- the

2    strength of the evidence, the international travel, the

3    brutal acts that this defendant himself committed -- there

4    simply are no conditions or combination of conditions that

5    would reasonably assure the safety of the community and

6    ensure that this defendant appears when he needs to be.  We

7    would ask the Court, therefore, to order him detained until

8    he is tried in this courthouse early next year.

9           Thank you.

10          THE COURT:  All right.

11          Yes, sir?

12          MR. COX:  May it please the Court.  I'm Gene Cox,

13   attorney for the defendant, Michael Miselis.

14          Your Honor, as an initial matter, we will concede

15   that the government has authority to seek detention in this

16   case.  So I'm not going to argue that this, as alleged, is

17   not a crime of violence; so I'll concede that.

18          But where I think the government has an argument

19   that doesn't meet the clear and convincing standard is, if we

20   look at the four factors -- and, you know, counsel went

21   through each of the factors, but I think he conflated a

22   couple of the -- you know, a couple of the factors.  And I'll

23   explain that to you.

24          First of all, talking about the nature of the

25   offenses, there's been no evidence presented by counsel, or

USA v. Miselis 3:18cr25 Dentention Hrg. 12/3/2018

1   that we're aware of, that my client was a leader of this

2   organization.  There's -- counsel did not present any

3   evidence that he was in charge of the organization, as

4   Mr. Rundo clearly was.  My client was just a follower.  He

5   went along.  So anything that he's alleged to have committed

6   would have been in the company of others in the organization

7   itself.  There's no allegation that he as an individual

8   traveled on his own and committed any violence on his own.

9          Also, you know, there are -- you know, looking at

10  the exhibits, there's a couple of allegations that he engaged

11  in violence, but overall he is a minor actor in the events

12  charged in this case.  Again, he was a follower.

13         Now, where I think that my client especially has

14  compelling evidence is when we talk about the history and

15  characteristics.  As counsel noted, you know, my client was

16  an excellent student in school.  He grew up in Stockton,

17  California.  He lived in the house that he was born in until

18  he went to college at UCLA.  He's an outstanding student.

19  He's finishing his doctoral program in aerospace engineering

20  at UCLA.

21         As the client noted, he also had a top secret

22  clearance.  They just don't hand those out like candy.  He

23  had to undergo an intensive investigation, looking into

24  everything possible: his possible drug use, any allegations

25  of any criminal activity.  They came up with nothing.  They

USA v. Miselis 3:18cr25 Dentention Hrg. 12/3/2018

1    awarded him this top secret clearance.  So prior to the

2    circumstances that are alleged in this case, my client had

3    led a voluminous life.

4         Also he has extensive familial ties.  As I

5    mentioned, his parents live in Stockton, California.  His

6    father is an optometrist.  He lived with his parents until he

7    went off to college.  He also has brothers and sisters that

8    he maintains close ties with.

9         As far as employment, as I mentioned, until the

10   circumstances in this case led to his termination of

11   employment, he was working with Northrop Grummon and had an

12   outstanding career before him.

13        There's been no allegations of any drug use at all,

14   or alcohol use, nothing like that.

15        Also, during the search, counsel talked about the

16   ammo and I think baseball helmets and bats and other things

17   that were found in his apartment, but there was nothing in

18   his apartment that was of an illegal nature.  I'm sure

19   counsel would have pointed that out if there had been.  So

20   all of those things that they found in his apartment were all

21   legal.

22        And I want to talk a little bit about, you know, his

23   foreign travel.  You know, he did go to Germany and Italy.

24   However, in both of those countries, he was not arrested.  He

25   engaged -- you know, besides being a tourist, he may have met

USA v. Miselis 3:18cr25 Dententlon Hrg. 12/3/2018

1   with other individuals there, but he didn't do anything

2   illegal.  Especially Germany is very, very strict with any

3   kind of activity, especially right wing groups that could --

4   you know, groups that could be engaged in any kind of

5   violence.  And he was not arrested by the Germans.  I'm sure

6   they knew he was there, and they didn't see anything wrong

7   with that.

8         He does have a girlfriend but, again, the girlfriend

9   is not alleged to have any involvement with any sort of white

10  supremacist group; so that really should not be something

11  that should be held against him.

12        And as far as, you know, showing up for court,

13  there's never been any allegation that he has, you know,

14  attempted to flee or that he's not shown up for any

15  appointments or anything like that.  Indeed, his parents were

16  willing to put up a $350,000 bond on his behalf.  And as I

17  mentioned, he has very close ties with his parents, and you

18  would have to believe that he'd be willing to have his

19  parents lose their house; and I think his background and

20  character and record shows that that's something he would not

21  do.

22        So, Your Honor, I think that -- you know, if you

23  look at the factors, one thing I was going to mention is the

24  fact that counsel, when he was talking about history and

25  characteristics of the person, he really didn't have any

USA v. Miselis 3:18cr25 Dentention Hrg. 12/3/2018

1   argument there, so he pointed you back to the allegations

2   committed in the offense by saying that, because he was

3   charged with those allegations, he has a deficient character.

4   So, in fact, he's conflating those two factors that you're

5   supposed to examine, and I would ask you to look at each of

6   those factors in and of themselves.  So please don't conflate

7   the fact that he's charged with an offense with his character

8   that he's shown throughout his life.

9        So we think that once you look at all of those

10  factors, you will conclude both that he's not a danger to

11  flee and he's not a danger to himself or others, and we ask

12  that you deny counsel's request to overturn the magistrate's

13  order.

14       THE COURT:  All right.

15       MR. CULLEN:  Your Honor, two final very quick

16  points, first with respect to his top secret security.

17       THE COURT:  Will there be any evidence other than --

18       MR. CULLEN:  Nothing other than our proffer and the

19  exhibits that we tendered to the Court.  And with respect to

20  those exhibits, Judge, Exhibit 3 is a grainy image, a still

21  frame, from one of these videos.  And I'll just orient the

22  Court and point out, the Defendant Miselis can be seen kind

23  of in the left center of that photograph.  He's got a black

24  backpack, a red hat, and you see an arm extending down and a

25  fist clenched that's clad in white tape, and he's punching

USA v. Miselis 3:18cr25 Dentention Hrg. 12/3/2018

1    someone who is lying on the ground.  I think I would be

2    remiss if I didn't point that out to the Court, somebody who

3    is defenseless, posing absolutely no risk or danger to him.

4          The second thing I would point out in response, Your

5    Honor, is, with respect to his top secret security clearance

6    with the defense contractor, as counsel noted, that security

7    clearance was revoked; and I think it's fair to say that when

8    it was issued, the United States government had no idea that

9    this defendant was a member of a militant white supremacist

10   group.

11         MR. COX:  Your Honor, just briefly.  Again, I think

12   counsel is conflating the first factor, nature of offense,

13   with the history and characteristics of the person; because

14   he's been charged with this offense, he has no character.

15   And there's a reason that that's a separate factor.

16         Also, counsel said that some factors came out after

17   the magistrate made her decision.  I'm aware of this de novo

18   hearing, but I believe that the magistrate, who actually

19   changed her mind -- she first denied bail, then she granted

20   it after looking further into the case.  Most of the things

21   that counsel brought up were extensively detailed in the

22   affidavit in support of the criminal complaint, which the

23   magistrate had access to.  So we think she made the correct

24   decision, and we ask Your Honor to make the same decision.

25         THE COURT:  But what was the travel, where you say

USA v. Miselis 3:18cr25 Dentention Hrg. 12/3/2018

1    he went to engage in violence?  What is -- summarize what

2    that is.

3              MR. CULLEN:  Sure.

4              THE COURT:  I mean, there are no violent acts in

5    Europe?

6              MR. CULLEN:  Not that we're aware of.  He was

7    meeting with members of militant white supremacist groups,

8    attending political rallies, taking photographs.  One of his

9    co-conspirators engaged in a mixed martial arts competition.

10   But we're not alleging and there's no allegation that there

11   were violent acts in Europe.

12             With respect to travel, this defendant traveled from

13   Southern California in a bus or a minivan that they rented

14   with several of his Rise Above Movement cohorts, to Berkeley,

15   California, in April of 2017, and engaged in riotous and

16   violent acts against people, similar to what they did in

17   Charlottesville.

18             With respect to travel in Charlottesville, this

19   defendant flew from Southern California across the country on

20   August 11, 2017, and engaged in riotous conduct on August 11,

21   on the grounds of UVa; and then, as we spent a lot of time

22   talking about this morning, on August 12, the following day,

23   on 2nd Street, and then later during the rally that morning

24   and early afternoon.

25             Once that was completed, he traveled back from

USA v. Miselis 3:18cr25 Dentention Hrg. 12/3/2018

1    Virginia to Southern California.  And I think it's important

2    to point out to the Court, when I'm talking about his history

3    and characteristics and I'm citing all of the items that were

4    seized, *How to Bomb the U.S. Government*, riot gear, thousands

5    of rounds of ammunition, that was 14 months after this

6    defendant is alleged to have come to Charlottesville.  This

7    isn't something he left behind.  This wasn't a one-off.  That

8    evidences his deep affiliation with this particular violent

9    extremist group.  And I would also argue that it indicates an

10   escalation in his conduct, his demeanor, his thoughts, and

11   his commitment.

12          THE COURT:  How large is the group?

13          MR. CULLEN:  I'm sorry?

14          THE COURT:  How large is the group?

15          MR. CULLEN:  The group itself, Your Honor, was

16   probably upwards of ten to 15 members.  Currently eight of

17   them are charged federally; four in this court and four in

18   California.  And it's my understanding that the investigation

19   is ongoing.

20          THE COURT:  Okay.

21          MR. COX:  Your Honor, again briefly.  You know,

22   there's no allegation that -- they don't have any evidence

23   that they've presented that shows that he specifically

24   traveled to Charlottesville to commit violence.  He did

25   travel to Charlottesville, as did hundreds of other people,

USA v. Miselis 3:18cr25 Dentention Hrg. 12/3/2018

1    to -- you know, to engage in free speech.  I mean, there was

2    violence that occurred, but they haven't shown you anything

3    where he actually planned to commit violence in

4    Charlottesville.

5         Also, as to those things that were found in his

6    apartment, counsel is attempting to have it both ways.  He

7    said that he tried to reset his phone when he was being

8    interviewed by customs upon re-entry into the country, but

9    yet he had all of this material that was still in his

10   apartment 14 months after Charlottesville.  If it was going

11   to be used in some sort of illegal plan and he was some sort

12   of mastermind, I'm sure he would have disposed of that.  He

13   knew that he was under surveillance.  He just did not have a

14   guilty mind; and for that reason, he did not get rid of this

15   stuff.  It was legal to have and, you know, he just didn't

16   have any kind of guilty intent.

17        So I think that shows that, you know, again, he was

18   a bit player here and he was not the planner of those things

19   that happened that he was charged with.

20        THE COURT:  What about this Exhibit 1, what is this

21   thing he has in his hand?

22        MR. CULLEN:  We believe that's the banner that's

23   depicted in Exhibit 7 that they unrolled and stood behind

24   after the melee on 2nd Street, where they brutally assaulted

25   a number of people.  They went into the park, they unfurled

1    the banner, the members of this group, and they posed for

2    pictures.

3         THE COURT:  He injured his hand?  What is the tape

4    on his hand for?

5         MR. CULLEN:  The significance of the tape, we have

6    learned through subsequent investigation that the

7    codefendant, his codefendant, Mr. Gillen -- and I believe

8    Mr. Daley's hands are taped as well -- they taped their hands

9    on the morning of August 12 at a residence in downtown

10   Charlottesville that they had rented for purposes of engaging

11   in this conduct.  Mr. Daley encouraged Gillen and Miselis to

12   tape their hands so they wouldn't break their hands when they

13   punched people in the riots that ensued.  Mr. Daley, in fact,

14   explained a number of times throughout August 12 that he had

15   to quit punching people in the head because he was injuring

16   his hands.

17        So the purpose of the tape, Judge, according to the

18   defendants and co-conspirators, is to protect their hands

19   when they punched people.  They did it -- they taped those

20   hands up before they even left the house that morning.  I

21   think that indicates what they intended with respect to what

22   was going to occur later in the day.

23        MR. COX:  Your Honor, I believe I have an alternate

24   plausible explanation as to why he taped his hands.  I don't

25   think counsel has discussed it very much, but they actually

USA v. Miselis 3:18cr25 Dentention Hrg. 12/3/2018

1   had long sleeve shirts.  They also had scarves that they

2   wore.  I think they anticipated that there was going to be

3   teargas possible at this event, because there had been at

4   other rallies that they went to; and the tape covered their

5   hands and minimized their exposure to teargas.

6           And so, again, there's no evidence that -- anything

7   from the defendant saying, I taped my hands so I could -- it

8   would somehow help me attack people.

9           And also I note with the poster that he had in his

10  hand, first, it was entirely legal, it was a poster, and it

11  was not used as a weapon in any way.  It was just a poster.

12          MR. CULLEN:  Judge, Mr. Kavanaugh -- in answer to

13  your question, I forgot the defendant broke his hand in

14  Berkeley, California four months before he came to

15  Charlottesville.  He admitted to breaking his hand during

16  that riot in text messages, and we have video of him punching

17  people.  So that's the primary reason why he and his

18  co-conspirators taped their hands, so they didn't further

19  injure their hands when they punched people at will on the

20  street in Charlottesville.

21          THE COURT:  All right.  Well, we'll take a recess

22  for a few minutes.

23          THE MARSHAL:  All rise.

24          THE COURT:  Is that all?

25          MR. CULLEN:  That's all we have, Your Honor.

USA v. Miselis 3:18cr25 Dentention Hrg. 12/3/2018

1          MR. COX:  That's all, Your Honor.

2          THE COURT:  Thank you.

3          THE MARSHAL:  All rise.

4          (Recess, 11:59 a.m. to 12:21 p.m.)

5          THE MARSHAL:  Remain seated and come to order.

6          THE COURT:  All right.  Pursuant to U.S.C.

7   3145(a)(1), I have reviewed the decision of the magistrate

8   judge de novo, as the Court with original jurisdiction, to

9   make an independent determination about whether the defendant

10  will be detained pending trial.

11          In addition to considering the evidence and the

12  argument presented today, I've reviewed the factors set forth

13  in U.S.C. 3142(g), including the nature and circumstances of

14  the offense charged, the weight of the evidence against the

15  defendant, history and characteristics of the defendant, and

16  the nature and seriousness of the danger to any person or the

17  community.

18          Having considered these statutory factors, the

19  record, and the arguments raised today, I find no condition

20  or combination of conditions of release that reasonably

21  ensure the appearance of the defendant and the safety of any

22  other person in the community.  I make this finding because

23  the offense charged alleges, apparently with substantial

24  photographic, video, and other evidence, that the defendant

25  traveled on at least four occasions for the purpose of

USA v. Miselis 3:18cr25 Dentention Hrg. 12/3/2018

1   committing violence at various rallies and did, in fact,

2   engage in acts of violence at these rallies.  Defendant's

3   alleged actions stem from his association with a radical

4   white supremacist organization that spreads its message and

5   pursues this message through violence.

6         Accordingly, there's nothing wrong -- nothing

7   criminal about having these thoughts, believing as the

8   defendant apparently does, but the evidence is that this is

9   not just an act of mischief, that these acts occurred because

10   of a strong belief by him and his group that they're the

11   appropriate thing to do to spread their message; and that

12   makes it a little different than just one who might have made

13   a mistake or pulled something on Halloween.

14         In addition, the defendant has traveled to Germany

15   and the Ukraine, we're told twice here, to meet with other

16   members of the organization.  Given the defendant's pattern

17   of travel with the purpose of committing violence and

18   defendant's radical white supremacist ideology that appears

19   to eventually manifest in violence, the Court finds that no

20   condition or combination of conditions of release would

21   reasonably assure the safety of any other person in the

22   community, or his appearance at trial.

23         It is ordered the defendant be committed to the

24   custody of the Attorney General pending trial in this matter

25   on January 14 through 18, 2019.

USA v. Miselis 3:18cr25 Dentention Hrg. 12/3/2018

1          To the extent practical, defendant is to be confined

2    separate from persons awaiting or serving sentences or being

3    held in custody pending appeal.  The defendant shall be

4    afforded reasonable opportunities for private consultation

5    with counsel.

6          Upon an order of this Court or request by the

7    attorney of the United States, the defendant is to be

8    released to the marshal for the purpose of court appearances.

9          I'll just point out with regard to the -- his -- I

10   know his parents are willing to put up their house but, as I

11   say, this is a matter of some person with very strong beliefs

12   that the Court is not satisfied that his beliefs would -- his

13   allegiance to family might not be as strong as his beliefs

14   might lead him to do, and that's from the -- that's what the

15   allegation and the evidence would indicate.

16         I do acknowledge the government has the burden of

17   proof by a preponderance of the evidence.

18         Anything else in the case?

19         MR. COX:  No, Your Honor.

20         MR. CULLEN:  No, Your Honor.

21         THE COURT:  All right.  Thank you all.

22         THE MARSHAL:  All rise.

23   (Proceedings adjourned, 12:26 p.m.)

24   ///

25

USA v. Miselis 3:18cr25 Dentention Hrg. 12/3/2018

1                              CERTIFICATE

2         I, JoRita B. Meyer, certify that the foregoing is a

3    correct transcript from the record of proceedings in

4    the above-entitled matter.

5    /s/ JoRita B. Meyer                    Date: 8/13/2019

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25